**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DANIELLE MARIE GEGAS,
       *Plaintiff,*

    vs.                      Case No.:

ST. MATTHEW'S UNIVERSITY
SCHOOL OF MEDICINE,
       *Defendant.*
_____

**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, REQUEST**
**FOR INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL.**

Plaintiff Danielle Marie Gegas sues Defendant St. Matthew's University School of Medicine for monetary damages, declarative judgment, and injunctive relief alleging:

**Nature of the Case**

1. Plaintiff Danielle Marie Gegas is currently registered as a medical student at Defendant St. Matthew's University School of Medicine. But despite Plaintiffs having successfully completed her coursework, Defendant refuses to allow Plaintiff to meet Defendant's graduation requirements by taking Part Two of the United States Medical Licensing Examination (USMLE). Now Plaintiff sues Defendant for: Count I: Breach of Contract; Count II: Defendant's Breach of an Implied Covenant of Good Faith and Fair Dealing;

Count III: Defendant's Fraudulent, Deceptive, and Unfair Trade Practices; Count IV: Fraud; Count V: Declaratory Action; and Count VI: Injunctive Relief  seeking damages and requiring that Defendant allow Plaintiff to proceed.

### Parties, Jurisdiction, and Venue

2. Plaintiff is a natural person and citizen of Franklin County, Ohio.

3. Defendant is a foreign corporation established under the laws of the Cayman Islands, chartered as St. Matthew's University (Cayman) LTD CORP., with an administrative office, mailing address, and Registered Agent in Orange County, Florida. And:

   a. St Matthew's (Cayman) LTD CORP is a Florida registered foreign for-profit corporation with a principal place of business on Grand Cayman Island in the British West Indies possessing an administrative office (see also Exhibit B listing Orange County as the address of record for Defendant), mailing address, and Registered Agent in Orange County, Florida from which Defendant manages its students;

   b. St. Matthew's University (Cayman) LTD CORP registered, "St. Matthew's University School of Medicine" as a fictitious name;

   c. Upon information and belief, St. Matthew's University (Cayman) LTD CORP may be owned or managed by R 3 Education Inc; and

2

d. R 3 Education Inc., is a Florida-registered foreign for-profit corporation with similar officers and the same Registered Agent as Defendant whose principal place of business and mailing address are in Worcester County,  Massachusetts but whose registered agent is also located in Orange County, Florida.

4. Pursuant to 28 U.S.C. §1331, because Plaintiff asserts claim(s) under 28 U.S.C. §§2201 and 2202, this Court possesses jurisdiction over this action.

5. Pursuant to 28 U.S.C. §1332, because the damages exceed $75,000.00 exclusive of interest and costs and because this action lies between citizens of different states, this Court possesses jurisdiction over this action.

6. Pursuant to 28 U.S.C. §1391, because Defendant maintains its Registered Agent and/or an administrative office in Orange County, Florida, venue is appropriate for this Court.

## **General Allegations and Background**

### Background Medical Education

7. Plaintiff is currently enrolled in Defendant's for-profit, foreign, allopathic medical school. See generally Exhibit A.

8. Plaintiff initially enrolled in Medical School at the American University of the Caribbean, St. Maarten on May 1, 2016.  Exhibit B.

9.  After Hurricane Irma's devastation of St. Maarten in 2017 and because of some academic difficulties, Plaintiff sought a fresh start and planned to continue her medical education elsewhere.

10. After considering other similar medical schools, Plaintiff accepted an offer to transfer to Defendant's for-profit foreign medical school where she matriculated on January 8, 2018, with an anticipated graduation date of December 25, 2021. *Id.*

11. However, when Plaintiff began her clinical rotations she was actually on track to graduate earlier in May 2021 and enter the 2021 Couples Match with her current spouse.

12. Plaintiff relied upon the May 2021 graduation date both in planning her wedding and in planning to enter the Couples' Match in 2021 with her now spouse who was attending

13. Plaintiff intended to earn her allopathic medical degree (M.D.) from Defendant and then complete her graduate medical education with her intended future spouse through the Couple's Match.

14. Had Plaintiff known at the time of her transfer that Defendant would delay her graduation, seemingly indefinitely, arbitrarily alter the passing score required for a pre-test that ultimately counts for nothing, Plaintiff would have gone to another Medical School.

4

15. By offering enrollment and permitting Plaintiff to transfer, by charging tuition, by providing basic didactic science coursework, and by helping to arrange her clinical Rotations, Defendant accepted Plaintiff a one of its medical students.

16. Notably, although Defendant discloses its requirement that students pass a third party owned and developed pre-test before taking Part Two of the USMLE in its Clinical Medicine Handbook, Exhibit F, no where on its website, Exhibit L, is that requirement advertised to perspective students.

17. And upon information and belief, Defendant has delayed or prevented many students like the Plaintiff from graduating based on their failure to achieve certification to take Part Two.

18. Additionally, earlier in her academic career, Plaintiff was appropriately diagnosed with attention deficit hyperactivity disorder (ADHD). To be clear, at all times relevant, Defendant was aware that Plaintiff had been diagnosed with ADHD.

19. Because of Plaintiff's difficulty reading, Plaintiff requested exam accommodations from Defendant in the form of additional time to read problems and formulate appropriate answers. But Defendant refused such accommodations. Now however, after having denied her request for accommodations, Defendant demands that Plaintiff request them before taking Part II, USMLE.

20. Defendant however, refused to provide Plaintiff with any exam accommodations and Plaintiff chose to proceed and complete her education without accommodations.

21. While Plaintiff may have been able to complete her medical education after transferring elsewhere, Plaintiff sought to complete her education elsewhere and found Defendant.

22. Despite having other choices, Plaintiff accepted Defendant's offer of enrollment.

23. Despite Defendant's refusal to provide exam accommodations Plaintiff successfully completed her required basic science coursework in medical school with Defendant in the Caribbean and passed Part One. Exhibit A DMG Transcript and USMLE Score.

24. To earn a degree as an allopathic medical doctor (M.D.) in the United States, after successfully completing a four year undergraduate degree, students must enroll in a four-year medical program where the first two years are spent in a basic-science, didactic environment and the last two years consist of clinical, skills based clerkships. See: Mowery YM. A primer on medical education in the United States through the lens of a current resident physician. *Ann Transl Med*. 2015;3(18):270. doi:10.3978/j.issn.2305-5839.2015.10.19(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4630550/ last accessed November 28, 2022).

25. Between years two and three, students are generally required to pass Part One of the United States Medical Licensing Examination (Part One) to move from their didactic education to their clinical clerkships. Part One is a one day multiple choice examination testing basic science knowledge relate to the first two years of medical school. *Id.*

26. Part Two of the United States Medical Licensing Examination (Part Two) is offered to students certified by their medical schools as being able to do so. Before the Covid-19 Pandemic, Part Two was a two day examination essentially comprised of two separate parts where: (1) Part Two Clinical Knowledge (Part Two CK) is a one day multiple choice examination based on clinical knowledge; and (2) Part Two Clinical Skills (Part Two CS) was a one day clinical assessment where medical students evaluate twelve standardized patients. *Id.*

27. After the Covid-19 Pandemic, alternatives were sought that did not require one on one clinical assessments. And, it appears that Part Two CS has been permanently paused by the USMLE and Part Two CK is all that remains. See https://www.usmle.org/step-exams (last accessed December 6, 2022).

28. Because most States require between 1 and 2 years of post-graduate medical education for medical licensure, with few exceptions, most medical students begin some form of post-graduate medical education as part of an internship/residency program. *Id.*

29. Medical Students enter a National Residency Internship Match (Match) in their fourth year of medical school to determine where they will complete their post-graduate training. *Id.*

30. In order to complete their training in the same geographic location, Couples may enter the Match together; the Couples Match. *Id.*

31. Also of note, post graduate medical education programs range between three and seven years with additional time for research and/or for some to earn additional degrees. *Id.* And finally, some medical sub-specialties require post graduate medical education beyond that which is typical in the form of fellowships which range between one and three additional years. *Id.*

32. To complete the United States Medical Licensing Examination process, after their first or second year of post-graduate medical education, most medical school graduates generally take a two day multiple choice clinical examination constituting Part Three of the United States Medical Licensing Examination (Part Three). *Id.*

33. For state licensure and before Step Three may be taken, Medical Students graduating from foreign medical schools must be certified by the Educational Commission for Foreign Medical Graduates (ECFMG). *Id.*

34. ECFMG requires that medical students pass Part One, Part Two CS, and Part Two CK before taking Part Three. *Id.*

35. Because the USMLE paused administration of Part Two CS, the ECFMG permits students such as the Plaintiff to achieve ECFMG certification via an alternative testing method including documented proficiency in English by examination or provided Defendant provide an attestation sheet that Plaintiff's classes were conducted in English and that Plaintiff is proficient in the English Language. As a native-born United States Citizen speaking English, Plaintiff certainly meets this requirement.

36. ECFMG certification requires that students like Plaintiff:

    a. Pass Part One; and

    b. Pass Part Two CK; and

    c. Pass an Occupational English Test; and

    d. Submit an attestation of each students' clinical skills from clinical rotations; and

    e. Graduate with a medical degree from a registered medical school such as Defendant.

37. With an intended graduation date of May 2021, Plaintiff timely entered the Couples Match but was unable to complete the process because Defendant refused to certify her to take Part Two.

38. Plaintiff has now been delayed for at least four years and may only potentially enter the 2024 Match. Defendant slowed, prevented, and

frustrated Plaintiff's progress a great deal all while accepting payment for tuition and fees.

39. With regard to ECFMG certification, Plaintiff:

  a.  Passed Part One;

  b.  But Defendant refuses to certify Plaintiff to take Part Two CK despite having passed the pre-test five times;

  c.  Cannot, according to Defendant's rules take the Occupational English Test;

  d.  Possesses an exemplary attestation (Exhibit B) from the Dean of Clinical Studies;

  e.  Unable to graduate because without taking Part Two CK, Plaintiff can't meet posted graduation requirements.

40. Further, Plaintiff's successful completion of most of her clinical clerkships and electives include patient encounter reports that satisfy USMLEE Part Two CS alternative requirements.

41. And under no circumstance does either the USMLE or ECFMG ever require that any student take the National Board of Medical Examiners (NBME) Comprehensive Clinical Science Examination (CCSE).

42. Notably, while medical students at medical schools in the United States generally complete their clinical rotations and electives within a two year period at hospitals associated with their schools, foreign medical school

students are generally forced to return to the United States to complete their clinical rotations and electives.

43. And unlike medical students in the United States that move between clinical rotations and clerkships, the travel required and the organization to arrange for appropriate experiences for foreign medical students may be more challenging.

44. As a result, foreign medical students may have more gaps between rotations and thus require more time to graduate – and unlike their United States' based counterparts, end up paying predominantly more tuition for a longer period to for-profit medical schools who primarily rely on tuition to pay bills, similar to law schools, and not to clinical income and federal support through the Centers for Medicare and Medicaid Services.

45. Plaintiff notes that two Clinical Deans visited the Cayman Islands during the last part of her second year to discuss delays during the last two years of medical school and the likelihood that graduation would be delayed and cost more. Plaintiff believes Defendant had no intention of allowing its students to timely graduate and made the business decision to require that students remain longer, paying more tuition, fees, and living costs.

46. In fact, while Plaintiff did everything she could to complete her clinical two years on time to graduate with her husband and enter the Couples Match,

Defendant told Plaintiff that she should slow down and not anticipate graduating in four years.

47. Indeed, Defendant encouraged Plaintiff to give up a clinical rotation that she already found in New York in favor of another student. When Plaintiff chose to remain because she had already relocated to New York and found housing, Defendant punished Plaintiff by subjecting her to longer intervals between rotations and by altering her schedule such that it would interfere with Plaintiff's wedding plans.

48. Plaintiff initially scheduled her wedding to another medical student between her 3rd and 4th year. When Plaintiff did not want to give up a New York Rotation to remain on schedule and in a place where she secured housing, Defendant stated, "Maybe if your priorities were on your medical education, you wouldn't be having these problems (trying to remain on target to graduate in four years).

49. Defendant also told Plaintiff that clinical rotation preference was not provided to her because it was only provided to students completing their third year – interestingly enough, this was while Plaintiff was completing her third year.

50. Of note, Plaintiff was competitive for the Couples Match and Match in general because despite applying for a position in ten Family Medicine Residency programs without Part Two results (required by most programs),

on the first day Plaintiff received two offers to interview and was waitlisted for a third interview. Where interviews are necessary to proceed and are only offered to good program candidates. Traditionally most programs do not offer interviews for any candidate not having already successfully taken Part Two.

51. The National Residency Matching Program (Match) uses a mathematical algorithm to match graduating medical student with available residency and fellowship positions.

   a. The Match occurs once per year generally in March;

   b. Medical students generally apply to the Match in October the year before the Match;

   c. There are strict application deadlines where students like Plaintiff must have been ECFMG certified in February for their Match Year;

   d. Couples may match together;

   e. After applications are received residency and fellowship positions offer interviews to candidates in which they possess an interest;

   f. Students and programs ultimately rank order their choices and are then Matched.

52. Because Defendant is a for-profit, foreign, allopathic medical school and because United States Medical Licensure generally follows a state-by-state regulated scheme, Plaintiff must meet certain well-known state-required

criteria for licensure. For example, The Florida Medical Practice Act, §§458 *et. seq., Fla. Stat* (2022) requires that  since the Plaintiff will not either graduate from an accredited allopathic medical school within the territorial jurisdiction of the United States, §458.311(1)(f)(1.a) *Fla. Stat.* (2022), or from an allopathic medical school accredited by the World Health Organization, §458.311(1)(f)(2.a) *Fla. Stat.* (2022), but will graduate from another foreign medical school, that the Plaintiff must:

a. Be certified by the Educational Commission for Foreign Medical Graduates (ECFMG), §458.311(1)(f)(3.b) *Fla. Stat.* (2022); and

b. Pass the examinations required by the ECFMG, *Id.*; and

c. Complete an approved residency or fellowship for at least two years in one specialty area, §458.311(1)(f)(1.c) *Fla. Stat.* (2022); and

d. Apply to the Florida Department of Health, pay the required fee, submit fingerprints, and undergo a criminal background check, §458.311(1)(g) *Fla. Stat.* (2022); and

e. Passed the United States Medical Licensing Examination (USMLE).

Defendant Arbitrarily and Capriciously Withheld Certification
From Plaintiff and Prevents Her Taking Part Two CS, and Part Two CK

53. On or about September 12, 2019, after successfully completing her basic science semesters and taking USMLE Part One, the ECFMG reported to both Plaintiff and Defendant that Plaintiff passed Part One and with Defendant's

approval, Plaintiff began her required clinical clerkships and electives constituting the final portion of Plaintiff's medical education.  Exhibit 1 Transcript and USMLE Step 1.

54. Plaintiff successfully completed all her clinical clerkships and electives in December 2021. *Id.*, and was on target to enter the Couples Match and graduate in May 2021. Exhibit B a Medical Student Performance Evaluation.

55. But *ab initio,* Defendant did its best to frustrate Plaintiff's intent. For example, at all times relevant, while coordinating her clinical clerkships and electives, Plaintiff made Defendant aware that:

    a.  To facilitate having a residence near each training site, Plaintiff requested clinical clerkships and electives in the Northeast Region;

    b.  Plaintiff's schedule was reasonably "tight" because she scheduled her wedding during the break between her third and fourth year or medical school;

    c.  But Defendant first asked and then brow-beat Plaintiff into giving up a clinical rotation in the Northeast.

    d.  And Defendant created as many barriers as possible that Plaintiff was required to overcome.

56. Ultimately, despite difficulty with scheduling her required clinical clerkships and electives, and despite the Covid-19 Pandemic, Plaintiff succeeded in scheduling the required rotations and electives, excelled while

on those clinical rotations and electives, and remained on schedule too graduate in May 2021. But again, Defendant frustrated her purpose and refused to allow that Plaintiff take Part Two.

57. For example, nowhere does the USMLE, NBME, or any other medical student testing agency require that medical students take a pre-test CCSE before taking Part Two.

58. Further, no medical school in the United States requires that students take or pass the CCSE before taking Part Two.

59. While the CCSE may provide some predictive value for passage rates of Part Two, CCSE results have no impact on licensure in any state.

60. And unlike Defendant who sets its own cut off for CCSE passage, no other school goes beyond the pass rate determined by the NBME.

61. Here the NBME pass rate cut off for the CCSE is and has been 209.

62. Inexplicably, Defendant altered this rate to require 220 and then later to require 222.  And Defendant communicated to Plaintiff that she required a score of 260 or that she would not move on.

63. Upon information and belief, Defendant's cut off varies based on the student, the time, and the situation. But is seemingly always in excess of that set by the NBME.

64. And, while Defendant lists required remediation for failing the CCSE, Plaintiff already met all such remediation requirements because although

Plaintiff only scored a 208 on her first test, on five subsequent tests Plaintiff exceeded 209. And Plaintiff exceeded 222 and was told that she was eligible for Part Two certification; at least until Defendant changed its mind. And while demanding Plaintiff seek exam accommodations, Plaintiff passed the CCSE exam five times. Finally and specifically with regard to remediation, Plaintiff already sought help via two separate and acceptable test preparation services; both having been recommended or approved by Defendant.

65. Defendant apparently modified its graduation requirements in 2019 and imposed a pre test requirement for Part Two CK and CS. oooThese pre-test requirements exceeded the standards set by the ECFMG or the United States Medical Licensing Examination(USMLE). See generally *Estrada* v. *St. Matthew's Univ. School of Medicine*. Case 6:20-cv-01763-CEM-EJK. M.D. Fla.

66. Specifically the student handbook states:

> All students are required to take a Comprehensive Clinical Science Examination (CCSE) [pre-test] to ascertain whether or not his/her preparation for the USMLE Step 2CK has been successful…Based upon the results of the CCSE, the student will take the USMLE Step 2CK examination or…If…remediation is needed, additional clinical rotations may be postponed (at the sole discretion of SMUSOM) until the student is scheduled to take the USMLE Step 2CK examination…If it is determined a student needs additional remediation, the student will enroll in a SMUSOM-approved remediation program… Once satisfactory progress is demonstrated, the student will retake the CCSE at his/her expense…If a student's performance on the CCSE in subsequent attempts is deemed deficient, the procedure for remediation described above will be

repeated until such time as the student's level of achievement on the CCSE is deemed satisfactory to the Clinical Department….

Exhibit F Clinical Medicine Handbook, page 233-34.

67. Importantly, before the USMLE will issue a permit for any student such as Plaintiff to take Part Two CK, Defendant must certify that the student (Plaintiff here) completed all USMLE prerequisites to take Part Two CK.

68. Upon information and belief Defendant refuses to certify any student completing all USMLE prerequisites unless and until all students also complete arbitrarily and capriciously imposed addition requirements, such as taking the CCSE and achieving an undefined score in excess of that requited to pass by the exam administration.

69. Like many students in the same situation, Defendant refuses to certify Plaintiff and she is stuck going around in circles with no end in sight; except potentially dismissal from the school.

70. To be clear, the USMLE does not require passage of the CCSE for certification to take Part Two CK.

71. After successfully completing her basic sciences and passing Part One, Plaintiff was on schedule to graduate in May 2021 and therefore participate in the March 2021 Couples Match.

72. Although not totally prepared, in an effort to enter the Couples Match with her spouse, something Defendant appeared to oppose throughout Plaintiff's

tenure as Defendant's student, Plaintiff requested to take the CCSE early. Plaintiff believed that taking the CCSE early would provide her with a sense of how she was doing clinically because of difficulties taking past exams. However, before taking the CCSE early, Plaintiff was concerned about any repercussions related to failure and contacted Dr. Reid to inquire about any potential penalties. Plaintiff relied on Dr. Reid's statement that there would be no penalties except that Plaintiff would have to pay to take the exam again.

73. And when she was not successful on her first CCSE exam in July 2021 after scoring 208 with a published pass cut-off score of 209, Plaintiff paid for and actively participated in a review course with Elite Medical Prep in August 2021. Exhibit D Plaintiff CCSE Results and see also Exhibit G Elite Medical Prep. In November 2022 during a call with Defendant (Dr. Clifton), who was seemingly unaware that Defendant had already utilized Elite Medical Prep, Defendant recommended that Plaintiff utilize Elite Medical Prep, admitting that it was an approved remediation test preparer.

74. Notably throughout its advertising and web pages, as further explained below, at no time did Defendant inform prospective students about any CCSE requirement. In Defendant's discussion(s) about graduation and eventual licensure in the United States, there are no mentions of the CCAS. Also importantly, at all times relevant, the passing score cut off for the CCSE

was set by the test administrator, The National Board of Medical Examiners (NBME) at 209. Despite this on June 8, 2022, Defendant notified it students that Defendant arbitrarily set its own cut off with a score of 220 to pass. And abruptly two months later, in August 31, 2021, Defendant arbitrarily and capriciously increased its passing score requirement to 222 decreasing the number of its students it would have to certify as eligible to take Part Two CK. Exhibit L Defendant CCSE Requirements.

75. In August 2021, after successfully completing a month of 1:1 tutoring with Elite Medical Prep., Exhibit G Elite Medical Prep., on September 2, 2021, Plaintiff took the CCSE for the second time and passed, scoring 211, where a passing score was 209. But Defendant refused to certify Plaintiff from taking Part Two CK.

76. During this period, along with her father, an academic physician in Ohio, Plaintiff met with Defendant (Dr. Clifton) twice. During the second meeting, Drs. Reid and Berardi-Demo joined Dr. Clifton. No remediation plan was provided and Defendant suggested that to move forward, Plaintiff would have to score at least 260.

77. Plaintiff continued to study and prepare independently and at Defendant's insistence ended up taking and passing the CCSE three more times (October 2021, December 2021, and May 2022) yet Defendant still refused to certify Plaintiff to take Part Two.

78. It is also important to note that on December 18, 2021, Plaintiff scored 223 on the CCSE exceeding Defendant's arbitrary and capricious standard cut off requirement of 222. And despite receiving Defendant's approval to move forward, Defendant still failed to certify that Plaintiff could take Part Two CK.

79. Again, Plaintiff complied with any remediation and after tutoring and preparation with a second approved professional test prep program, STATMed, Defendant was informed by STATMed on July 5, 2022, that:

> [Plaintiff], a fourth-year student at the St. Matthews School of Medicine…successfully completed our STATMed Boards Workshop for students, a one-on-one platform where we help self-identified "bad test-takers" at the medical boards level learn how to consistently show what they know on board exams. [Plaintiff] was a model client for the Boards Workshop due to her ADHD diagnosis and issues with reading…[Plaintiff] was a model student and got a great deal from the workshop. I was very impressed with her overall and expect her to do great things with the tools taught to her once she has had time to train with them and implement them. She is now poised to train independently moving forward as she prepares for her USMLE Step 2.

> Exhibit H STATMed

80. And for the 5th consecutive time taking the CCSE, Plaintiff again passed scoring 220, where passing was 209.

81. Yet Defendant still refused to certify Plaintiff to take Part Two.

82. And: despite having passed the CCSE on the second, third, fourth, fifth, and sixth times; despite having taken two separate approved review courses; and despite failing to provide Plaintiff with exam accommodations

themselves, Defendant continues to fail to certify Plaintiff and allow her to either take Part Two CK or graduate while continuing to demand that Plaintiff continue taking the CCSE, pay for and complete independent test preparation courses, and Defendant now insists that Plaintiff apply for exam accommodations!

83. Finally despite the test's creator publishing a pass cut off, Defendant inexplicably chooses to utilize their own, undefined pass cut-off that upon information and belief is different for each of Defendant's students.

84. Defendant's refusal to certify Plaintiff and permit her to take Part Two already damaged Plaintiff in that she was:

   a. Prevented from participating in the Couples Match 2021`with her husband despite having received some assurance(s) that they were both competitive for at least one particular program together;

   b. Prevented from participating in the Match in 2022;

   c. Being threatened with being removed as a student for remaining too long; and

   d. Threatening Plaintiff with disciplinary action when Plaintiff tried to change clinical clerkships with another student and suggesting that that was not professional when Defendant itself unsuccessfully tried to force Plaintiff to trade a clerkship with another student or be

punished by being assigned to a geographic area where Plaintiff had no housing or family.

e.  Damaging Plaintiff's Residency Match prospects.

85. Regardless, even with Defendant's threats and overt hostility, Plaintiff excelled academically during her tenure with Defendant, participated in community service, and managed time to do research and publish. Exhibit E, Plaintiff CV

86. Notably, Defendant's own Dean of Clinical Sciences evaluated Plaintiff, Exhibit B, and on Plaintiff's Medical Student Performance Evaluation wrote:

> [Plaintiff's] steadfast and focused commitment to the study of medicine is reflected by her tenacious and successful completion of her education despite multiple events of adversity. These include the devastation of Sint Maarten Island due to Hurricane Irma in 2017 and her proactive efforts to maintain academic progress in clinical clerkships during the COVID-19 pandemic.

> [Plaintiff] exemplified maturity and dependability during her clinical rotations. She fulfilled her responsibilities in an exceptional manner. This was reflected when she was the sole medical student at times in the NICU during her Pediatrics rotation. In addition, she was one of two students who chose to stay at the end of her OB/GYN rotation to help with high patient volume in the clinic, and she was the medical student most often relied upon for emergency operations during her Surgical rotation.

> [Plaintiff] embodies poised leadership as reflected in her work as a research associate at Nationwide Children's Hospital in Columbus, Ohio. As part of the Genetics team working with cardiac anomalies, Danielle was responsible for critical, time-sensitive milestone checks as the patient was undergoing surgery. As an integral part of the surgical team, she was the single point of accountability providing

confirmatory test results within minutes and a recognized leader.

Exhibit B: Dr. Salter., page 1

87. With the exception of retaking the Internal Medicine  Shelf exam on one occasion, at no time was Plaintiff required to repeat or otherwise remediate any coursework during her medical education. *Id.* page 2.

88. At no time was Plaintiff the recipient of any adverse action(s) by the medical school or its parent company. *Id.*

89. With regard to her professional performance, the Dean of Clinical Sciences also wrote:

> [Plaintiff] met all the stated objectives for professionalism at St. Matthew's University School of Medicine. Throughout their medical school education, we have assessed all students' commitment to the highest standards of professional responsibility, adherence to ethical principles, and sensitivity in all interactions with patients, families, colleagues, and others with whom physicians must interact in their professional lives. More specifically, each SMU student is expected to: show compassion in the treatment of patients and respect for their privacy, dignity and beliefs; demonstrate personal integrity, ethical behavior and altruism; exhibit dependability and responsibility; acknowledge and accept the limitations in his or her knowledge and clinical skills; demonstrate the ability to deal with uncertainty; demonstrate skills in effectively reconciling conflicts; demonstrate the ability to identify and utilize effective personal coping strategies; and develop sensitivity to discuss the ethical issues involved in clinical practice and the use of human subjects in clinical research.

> *Id.,* pages 2-3.

90. And the Dean of Clinical Sciences confirmed Plaintiff's transcript that the Plaintiff successfully completed the Basic Science portion of her medical education. *Id.*, page 3.

91. Not only did the Dean of Clinical Sciences indicate that Plaintiff completed her clinical clerkships and electives with all "Honors" and "High Pass" grades, but that Plaintiff's cumulative grade point average (GPA) met or exceeded those of her colleagues in most cases. *Id.*, page 7.

92. In summary, Defendant's Dean of Clinical Sciences concluded that Plaintiff was, "a truly outstanding student in every way, " and:

> [That Plaintiff] has proven to herself and to others that she is a highly capable student who is focused and performs well in all circumstances. She has demonstrated an understanding and proficiency in each of our school's core competencies. She has earned high praise in all of her clinical rotations and demonstrated overall excellence relative to her peers. Based on her documented strong past summative and formative evaluation performance,

> [Plaintiff's] CV is outstanding for any medical student. Her gene therapy research experience was impressive. I love how well rounded she is. Anyone who has the experience in coaching that Plaintiff has, understands team dynamics. Almost universally that translates into how these students function in a residency program. Plaintiff was in my online course (transition to residency) during COVID when the core hospitals were closed to students. She was always prepared, engaged in the discussions and provided perspectives that were quite different from her classmates. I enjoyed having her in my class. I predict that she will carry these strengths into her residency training and contribute greatly to the program, her colleagues, her teachers and her patients. [Plaintiff's] transcript documents that she is a truly outstanding student in every way.

93. But for Defendant's inexplicable refusal to certify Plaintiff to take Part Two CK, because Plaintiff was a very competitive candidate for the 2021 Match, Plaintiff has now been forced to delay her post-graduate education, pay fees, costs, tuition, and living expenses, and was unable to enter the Couples Match with her husband in 2021.

94. Importantly, similar to the USMLE and the ECFMG, even Defendant's own official course catalog, Exhibit I page 25 fails to include the CCSE as a graduate requirement.

95. And, Defendant itself advertises that its graduation requirements appear to match thee ECFMG and not include the CCSE stating:

> **In order to be licensed and practice medicine in the United States, the Educational Commission for Foreign Medical Graduates (ECFMG) requires students to take and pass the United States Medical Licensing Examination (USMLE).**
>
> St. Matthew's University students and graduates are eligible to sit for these exams. The USMLE has three steps, two of which are taken by students while in medical school. Students must take and pass USMLE Step 1 prior to beginning the Clinical Sciences curriculum. USMLE Step 2 Clinical Skills (Step 2 CS) and Step 2 Clinical Knowledge (Step 2 CK) are taken prior to graduation. Step 3 of the USMLE, the final step for licensing, is taken after graduation, during, or at the conclusion of residency training

Exhibit J Defendant Website FAQS

96. At this time, it is neither reasonable nor practical for Plaintiff to transfer to another medical school. And, given the Defendants past history of dismissing students,

97. If Defendant does not certify Plaintiff, Defendant will dismiss Plaintiff and effectively end her medical career.

98. Plaintiff should have graduated in May 2021 ago given her transfer status and anticipated graduation date where the delay has been caused by Defendant.

99. To date, Plaintiff paid Defendant $451,218.00 in tuition, fees, and costs and expended in excess of $59,177.96 in housing, room and board totaling $510,395.95.

100.    Defendant's failure to permit that Plaintiff progress, after having paid  required that Plaintiff retain undersigned attorney to represent here interests and Plaintiff is obligated to pay a reasonable fee for such services.

101.    Defendant failed to allow any further administrative remedies despite Plaintiffs having sought them and all other conditions precedent to suit have been met, waived, or otherwise excused.

102.    Finally of note, while Defendant states that it only charges for five semesters of tuition for required clinical rotations and electives, Plaintiff's comprehensive invoice, Exhibit M, indicates that tuition was charged well after Plaintiff's expected graduation date according to the delays.

## Count I: Defendant's Breach of Contract

103.    Plaintiff restates paragraphs 1-102 and further states:

104.     The Clinical Medicine Handbook, Exhibit F, constitutes a valid, binding, explicit contract between Defendant School and Plaintiff Student.

105.     Defendant materially breached the terms of it is contract by failing to certify Plaintiff and allow her to take Part Two CK.

106.     Defendant's failure to permit Plaintiff to progress actually caused harm to the Plaintiff.

### Count II: Defendant's Breach of an Implied Covenant of Good Faith and Fair Dealing

107.     Plaintiff restates paragraphs 1-102 and further states:

108.     Plaintiff Student and Defendant School are parties to a clearly defined, written contract, Exhibit F, The Clinical Medicine Handbook.

109.     This contract was neither negotiated nor were any negotiations permitted by Defendant. It was unilaterally drafted, containing hidden ambiguous terms that purport to allow Defendant to unilaterally, arbitrarily, and capriciously delay a student's progress according to Defendants own whim.

110.     Defendant intentionally, deliberately, and consciously acted, or failed to act in the performance of its responsibilities and duties, inextricably causing delay, hardship, expense,  and frustrating Plaintiff's intent according to the contracts own purpose and ultimately prohibiting Plaintiff's success.

111.     Defendants breach of an implied covenant of good faith and fair dealing in the provision of a medical education and permitting students who successfully meet ECFMG guidelines to graduate and proceed forward with their graduate medical education, actually harmed the Plaintiff and all similarly situated students.

## Count III: Defendant's Fraudulent, Deceptive, and Unfair Trade Practices

112.     Plaintiff restates paragraphs 1-102 and further states:

113.     Pursuant to the Florida Deceptive Trade and Unfair Trade Practices Act §§ 502 *et. seq., Fla. Stat.* (2022), Defendant is a for-profit medical school intent on benefiting its shareholders at the expense of the students it purports to educate.

114.     :Pursuant to its website, in addition to limited scholarships, Defendant was approved to participate in the United States William D. Ford Federal Direct Unsubsidized Stafford and the Federal Direct Grad PLUS Loan programs administered by the United States Department of Education. Exhibit K.

115.     Defendant advertises throughout the North America and in Florida, see https://www.stmatthews.edu, and uses its website and downloadable materials to misinform and deceive potential students and transfer students about its graduation requirements. See also Exhibit I referencing ECFMG

29

requirements but containing no mention of having to take the CCSE and potentially far exceed any passing score required by the test administrators.

116.     Defendant advertises high Part One passage rates but fails to include its Part Two CK or CS passage rates. Or that it requires that students take a pretest and achieve some number obviously in excess of what the test administrators require.

117.     By arbitrarily requiring that Students exceed the CCSE test administrator's passing score, Defendant delays Plaintiff and all similarly situated students from completing their education imposing additional fees, tuition, courses, and other expenses. Notably Defendant profits from their own mandated delay.

## **Count IV: Fraud**

118.     Plaintiff restates paragraphs 1-102 and further states:

119.     Defendant's false statements of material fact and misrepresentations about its testing and graduation requirements induced Plaintiff to transfer to Defendant's medical school, relocate, enroll, pay tuition, and actively work towards a successful completion of her medical degree.

120.     Defendant knew its misrepresentations were false when published or made.

121.     Defendant knew its misrepresentations would induce Plaintiff and other similarly situated students to act in reliance upon them.

122.    Plaintiff did not know that Defendant misrepresented its testing and graduation requirements.

123.    Plaintiff and upon information and belief, other students  acted in reliance upon Defendant's false statement and suffered damages and harms.

### Count V: Declaratory Judgment

124.    Plaintiff restates paragraphs 1-102 and further states:

125.    Pursuant to 28 U.S.C. §§2201-2202, Plaintiff respectfully requests that this Court enter a declaratory judgment finding:

    a.  Defendant engaged in trade or commerce supplying goods and services;

    b.  Plaintiff is a consumer of Defendant's goods and services

    c.  Defendant falsely represented to incoming students and transfer students requirements for graduation and licensure;

    d.  Defendant used such false representations to induce students to pay substantial sums, generally far in excess of those for medical schools located within the United States, by borrowing large sums from the United States and/or other third parties;

    e.  Defendant altered and applied its graduation requirements in an arbitrary and capricious manner with different standards for different students;

f.  Under the guise of providing a medical education, Defendant engaged in otherwise prohibited acts;

g.  Defendant violated its obligations of good faith and fair dealing with its students;

h.  Defendant unnecessarily delayed its own students' progress forcing them to remain in school longer.

i.  Defendant will cause irreparable harm to Plaintiff by failing to allow her to even attempt passage of Part Two CK.

126.    There exists a *bona fide*, actual, present, and practical need for this declaration.

127.    The facts underlying this declaration are ripe, easily ascertainable, and a declaration will resolve aa present controversy.

128.    Plaintiff seeks relief and not merely this Court's provision of legal advice.

129.    All antagonistic and adverse interests are before the Court or will be following proper process.

130.    Defendant possesses a clear, actual, present, adverse, and antagonistic interest in the subject matter in fact or in law.

131.    The facts or law applicable to the facts of this case require this declaration to resolve Plaintiff's rights, powers, and privileges and the Defendant's liabilities or duties.

## Count VI: Injunctive Relief

132.    Plaintiff restates paragraphs 1-102 and further states:

133.    Plaintiff seeks injunctive relief to prohibit Defendant from taking any adverse action against her or from dismissing her from school for all the aforementioned reasons.

134.    It is likely that Plaintiff will succeed on the merits because given the allegations above and considering:

   a. Plaintiff successfully completed and performed her basic science coursework (Exhibit A) better than many of her peers and passed Part One of the USMLE even after Defendant denied Plaintiff reasonable exam accommodations;

   b. Plaintiff performed exceptionally well according to the Dean of Clinical Sciences (Exhibit D) during her clinical clerkships and electives

   c. Plaintiff passed five consecutive pre-tests (CCSEs) pursuant to the pass-fail cut off published by the test administrator without exam accommodations; and

   d. Plaintiff completed two separate exam tutoring programs,

   e. Neither the ECFMG nor the USMLE require passage of the CCSE, a pretest with absolutely no impact on future licensure or performance;

f.   Defendant falsely advertised that it followed ECFMG guidelines that do not actually include the CCSE.

135.   Plaintiff is suffering and has suffered irreparable harm because no damage award could possibly:

a.   Return the year she's lost trying to meet Defendant's unending, impossible, and ambiguous guidelines;

b.   Allow her to participate in the Couples Match when her husband matched two years ago in 2021;

c.   Provide any recompense for the explanation, time, and difficulty that she will endure each and every time she applies for licensure, certification, or privileges with any state, insurer, or facility where she will have to explain her graduation's delay and her failure to progress like any other medical student.

d.   Despite claiming that its students find a wealth of Match opportunities at top post-graduate training programs in the United States, Defendant's actions will adversely impact and may reasonably prevent Plaintiff from Matching with any desirable position.

136.   Plaintiff's injuries far outweigh any potential harm to Defendant. Because, Plaintiff's is harmed by Defendants failing to certify Plaintiff and allow her to take Part Two CK, a pretest but not an actual test that counts for anything other than as a possible predictor of passing Part Two CK.

a.  The worst that could happen is that Plaintiff could fail Part Two CK and have to undergo remediation as provided.

b.  The harm in not allowing any student such as Plaintiff to take Part Two CK, and possibly fail, is totally inexplicable when that student would not be able to graduate without having passed Part Two CK.

c.  The only potential for harm is to the Plaintiff and there is no possibility of harm to Defendant.

d.  Defendant could potentially argue that a high failure rate for Part Two CK might impact its advertising, but its website only really advertises the passage rate for Part One.

e.  Here the non-economic irreparable and actual economic harm being inflicted upon the Plaintiff by the Defendant far outweigh the absence of any potential harm to the Defendant by merely allowing the Plaintiff to take an exam for which she has been preparing an inordinate length of time.

137.    An injunction requiring that Defendant certify that Plaintiff be allowed to take Part Two CK would serve the public interest because:

a.  If Plaintiff successfully takes Part Two CK, graduates, and purees her intended Family Medicine Residency, Plaintiff will actually serve the public interest by providing needed primary care physicians;

b. If Plaintiff fails Part Two CK, she will remain in school pursuant to the remediation guidelines that are in place. And there is no risk of harm to the public because as a medical student, Plaintiff will be heavily supervised at all times;

c. While there exist sparse data about whether Part Two CK passage has any relationship to actual clinical care and there is no reason to suspect that Plaintiff will harm the public because according to Defendant's Dean of Clinical Studies:

> [Plaintiff] has proven to herself and to others that she is a highly capable student who is focused and performs well in all circumstances. She has demonstrated an understanding and proficiency in each of our school's core competencies. She has earned high praise in all of her clinical rotations and demonstrated overall excellence relative to her peers. Based on her documented strong past summative and formative evaluation performance…I predict that she will carry these strengths into her residency training and contribute greatly to the program, her colleagues, her teachers and her patients. **[Plaintiff's] transcript documents that she is a truly outstanding student in every way**.

> Exhibit B Dean of Clinical Studies

d. Injunctive relief would not only serve those in the general public considering enrolling in medical school but all those desiring to find clear, honest, unambiguous information posted by educational institutions about those schools and their graduation requirements.

e.  Injunctive relief will require that Defendant honestly present its graduation requirements to the general public before enrollment occurs and before governmental funds are borrowed.

f.  Finally, given widespread negative coverage of for profit medical institutions, the public interest will also be served by requiring that Defendant and those of similar ilk, themselves comply with and honor the explicit terms of unambiguous if unilaterally drafted contracts with their student consumers.

## **Prayer for Relief**

Wherefore, because: (1) Plaintiff successfully completed her basic science coursework (Exhibit A) with Defendant and passed Part One of the USMLE; (2) Plaintiff performed exceptionally well according to the Dean of Clinical Sciences (Exhibit D) during her clinical clerkships and electives; passed five consecutive pre-tests (CCSEs) pursuant to the pass-fail cut off published by the test administrator without exam accommodations; (3) Plaintiff excelled in her basic sciences without Defendants having approved exam accommodations for Plaintiff; and (4) Plaintiff completed two separate exam tutoring programs, Plaintiff Danielle Gegas respectfully requests that this Court:

I.  Injunctive Relief:

1. Enjoin and prevent Defendant from dismissing Plaintiff until she is able to take Part Two CK and successfully graduate from Defendant's medical school;

2. Enjoin and require that Defendant certify Plaintiff to the ECFMG and allow Defendant to take Part Two CK;

3. Enjoin and require that Defendant permit Plaintiff to complete any remaining coursework, and take any other necessary exams to permit graduate;

4. Enjoin and require that Defendant allow Plaintiff to successfully graduate unless Plaintiff is not able to meet exam passage criteria determined by unrelated third party testing administrators administering their own such testing (i.e. USMLE pass requirement for Part Two CK).

5. Enjoin and require that Defendant assist Plaintiff with entering the Match closest in time to her graduation, help identify a family medicine residency program, and help explain Plaintiff's delay using a mutually agreeable explanation.

6. Enjoin and require that Defendant allow Plaintiff to graduate and confer her medical doctor degree.

7. Enjoin and require that after Defendant graduates Defendant provide, on demand at any time, evidence of Plaintiff's having successfully graduated from Defendant's medical school.

8. Finally enjoin Defendant from making, publishing , or advertising any negative, defamatory, or libelous statements about Plaintiff.

9. Award any other applicable relief deemed proper by the Court.

II. Breach of Contract Relief:

1. Find that a valid contract existed;

2. Find that Defendant materially breached the contract resulting in economic and non-economic harm to the Plaintiff

3. Award economic damages to the Plaintiff with pre-judgment interest and costs.

4. Award non-economic damages to the Plaintiff with pre-judgment interest and costs.

5. Award any other applicable relief deemed proper by the Court.

III. Breach of Implied Covenant of Good Faith and Fair Dealing Relief:

1. Find that Defendant possessed a Covenant of Good Faith and Fair Dealing with Plaintiff.

2. Find that Defendant breached that Covenant of Good Faith and Fair Dealing with Plaintiff.

3. Award economic damages to the Plaintiff with pre-judgment interest and costs.

4. Award non-economic damages to the Plaintiff with pre-judgment interest and costs.

5. Award any other applicable relief deemed proper by the Court.

IV. Relief from Defendant's Fraud:

1. Find that Defendant possessed a Covenant of Good Faith and Fair Dealing with Plaintiff.

2. Find that Defendant breached that Covenant of Good Faith and Fair Dealing with Plaintiff.

3. Award economic damages to the Plaintiff with pre-judgment interest and costs.

4. Award non-economic damages to the Plaintiff with pre-judgment interest and costs.

5. Award any other applicable relief deemed proper by the Court.

V. Relief from Deceptive Trade and Unfair Practices:

1. Find that Defendant violated the Deceptive Trade and Unfair Practices Act §§501 *et. seq., Fla. Stat.(2022)* by misrepresenting graduation requirements; and

2. Find that Defendant violated the Deceptive Trade and Unfair Practices Act §§501 *et. seq., Fla. Stat.(2022)* by unfairly impeding Plaintiff's progress towards graduation and licensure; and

3. Award economic damages to the Plaintiff with pre-judgment interest and costs.

4. Award non-economic damages to the Plaintiff with pre-judgment interest and costs.

5. Awarding Attorney's Fees and Costs as permitted.

6. Award any other applicable relief deemed proper by the Court.

VI. Declaratory Relief finding:

1. Plaintiff is a consumer of Defendant's goods and services

41

2. Defendant falsely represented to incoming students and transfer students requirements for graduation and licensure;

3. Defendant used such false representations to induce students to pay substantial sums, generally far in excess of those for medical schools located within the United States, by borrowing large sums from the United States and/or other third parties;

4. Defendant altered and applied its graduation requirements in an arbitrary and capricious manner with different standards for different students;

5. Under the guise of providing a medical education, Defendant engaged in otherwise prohibited acts;

6. Defendant violated its obligations of good faith and fair dealing with its students;

7. Defendant unnecessarily delayed its own students' progress forcing them to remain in school longer.

8. Defendant failed to timely allow Plaintiff to graduate with her degree.

9. Defendant will cause irreparable harm to Plaintiff by failing to allow her to even attempt passage of Part Two CK.

## Demand for Jury Trial

Plaintiff respectfully requests a trial by jury on all issues so triable.

## Certificate of Service

I certify that on this date I electronically filed the foregoing with the Clerk of Court via the CM/ECF system and will personally serve the Defendant by service of process to its Florida-designated Registered Agent.

**Respectfully submitted this 9th  day of December 2022**

**The Florida Legal Advocacy Group of Tampa Bay**
 */s/  Adam S. Levine*
Adam S. Levine, M.D., J.D.
Florida Bar #78288
1180 Gulf Boulevard, Suite 303, Clearwater, FL 33767
(727) 512 – 1969 [Telephone]
(866) 242 – 4946 [Facsimile]
aslevine@msn.com [Primary E-mail]
alevine@law.stetson.edu [Secondary E-mail]
Attorney for the Plaintiff