# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DANIELLE MARIE GEGAS**

      **Petitioner,**

**v.**                       **Case No: 6:22-cv-2299-PGB-EJK**

**ST. MATTHEW'S UNIVERSITY**
**SCHOOL OF MEDICINE,**

      **Defendant,**

_____/

## AMENDED, VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, REQUEST FOR INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

On December 9, 2022 Plaintiff Danielle Marie Gegas sued Defendant St. Matthew's University School of Medicine for (I) Breach of Contract; (II) Defendant's Breach of an Implied Covenant of Good Faith and Fair Dealing; (III) Defendant's Fraudulent, Deceptive, and Unfair Trade Practices; (IV) Fraud; (V) Declaratory Action; and (VI) Injunctive Relief (Doc. 2) seeking monetary damages, declaratory judgment, and injunctive relief allowing Plaintiff to complete her medical education and take Part II of the United States Medical Licensing Examination ("USMLE Part II" or "Part II"). On March 24, 2023, Defendant filed a Motion to Dismiss Plaintiff's Claim for Failure to State a Claim. Doc. 22. On April 14, 2023, Plaintiff responded to Defendants Motion, Doc. 23, and Defendant subsequently filed an unopposed response on May 16, 2023. Doc 30.

On August 25, 2023, this Court considered the Motion to Dismiss, Doc. 33, and with regard to count: (I) Breach of Contract where the Court found that, "Plaintiff…plausibly alleged a breach of contract here…and [this count] will not be dismissed before the exchange of discovery,"; (II) Defendant's Breach of an Implied Covenant of Good Faith and Fair Dealing where, "The Court [found] that Plaintiff's breach of good faith claim survive[d],"; (III) Defendant's Fraudulent, Deceptive, and Unfair Trade Practices where, the "Court [found] that Plaintiff plausibly alleged an FDUPTA claim,"; (IV) Fraud where the Court dismissed this count without prejudice for failing to meet a heightened pleading requirement but allowed leave to amend on or before September 1, 2023; (V) Declaratory Action where, "[T]he Court exercise[ed] its discretionary authority to keep Plaintiff's request for declaratory relief intact at this stage in the litigation"; and finally for count (VI) Injunctive Relief where, the Court responded to a separately filed Motion by Order, Doc. 34, that Plaintiff comply with Local Rules 6.01 and 6.01 and either amend or abandon on or before September 1, 2023.

Accordingly, on September 1, 2023, Plaintiff filed both an Amended Verified Complaint to meet the heightened pleading requirements for proving count IV Fraud and an Amended, Verified Motion for Preliminary Injunction.

## Nature of the Case

1. Plaintiff Danielle Marie Gegas is currently registered as a medical student at Defendant St. Matthew's University School of Medicine (SMUSOM). But

despite Plaintiff's having successfully completed her required: basic science and clinical coursework (Exhibit A); receiving an evaluation that documented that Plaintiff was an outstanding medical student (Exhibit B); passing Part I of the USMLE (*Id.*); and taking an SMUSOM required Pre-test (designed and published by the National Board of Medical Examiners (NBME) to assess a medical student's readiness to successfully take Part II of the USMLE (see Exhibits C  and D) 6 times with NBME passing (Score=209) 5 times, and SMUSOM passing score (Score=222, or 59.5%) in December 2021 (Exhibits D, L),  Defendant continues to prevent Plaintiff's taking Part II, complete any remaining graduation requirements, and enter the National Residency Match Program (Match) to select an Internship/Residence to complete Plaintiff's post-graduate medical education.

### Parties, Jurisdiction, and Venue

2. Plaintiff is a natural person and citizen of Franklin County, Ohio.

3. Defendant is a foreign corporation established under the laws of the Cayman Islands, chartered as St. Matthew's University (Cayman) LTD CORP.("SMU"), with an administrative office, mailing address, and Registered Agent in Orange County, Florida. And"

    a. SMU is a Florida registered foreign for-profit corporation with a principal place of business on Grand Cayman Island in the British

West Indies but possessing an administrative office (See Exhibit B listing Orange County as Defendant's address of record), mailing address, and Registered Agent in Florida from which Defendant manages its students;

b. SMU registered, "St. Matthew's University School of Medicine" (SMUSOM) with Florida as a fictitious name;

c. Upon information and belief, SMU and SMUSOM may be owned or managed by R3 Education, Inc.;

d. R3 Education Inc. is also a Florida registered foreign for-profit corporation with similar officers and the same Registered Agent in Orange County, Florida as SMU but with a principal place of business and mailing address in Worcester County, Massachusetts.

4. Pursuant to 28 U.S.C. §1331, because Plaintiff asserts claim(s) under 28 U.S.C. §§2201 and 2202, this Court possesses jurisdiction over this action.

5. Pursuant to 28 U.S.C. §1332, because Plaintiff's damages exceed $75,000.00 exclusive of interest and costs and because this action lies between citizens of different states, this Court possesses jurisdiction over this action.

6. Pursuant to 28 U.S.C. §1391, because Defendant maintains its Registered Agent and/or an administrative office in Orange County, Florida, venue is appropriate for this Court.

## General Allegations and Background

7. At the time of filing Plaintiff was enrolled in Defendant's for-profit foreign, allopathic medical school. Exhibit A.

8. Plaintiff initially enrolled in Medical School at the American University of the Caribbean, St. Maarten on May 1, 2016.

9. Following Hurricane Irma's devastation of St. Maarten in 2017, and because of some academic difficulties, Plaintiff sought a fresh start and planned to continue her medical education elsewhere.

10. After considering other similar medical schools and reviewing the available data online for other Caribbean Medical Schools, including their historical Match placements and Part I and Part II USMLE passage rates, Plaintiff accepted an offer to transfer to Defendant's for-profit medical school where she matriculated on January 8, 2018, with an anticipated graduation date of December 25, 2021. Exhibit A.

11. In part, Plaintiff selected Defendant because it published Part I and Part II USMLE passage rates that were higher than most if not all similarly situated medical schools. But at no time before her matriculation, did Defendant ever explain to Plaintiff that SMUSOM required any Pre-test or that the score for such a Pre-test varied from the passing score published by the NBME.

12. Earlier in Plaintiff's academic career, Plaintiff was diagnosed with attention deficit hyperactivity disorder (ADHD).

13. Because of Plaintiff's disability, and difficulty reading, after matriculating, Plaintiff requested exam accommodations from Defendant in the form of additional time to read and formulate examination answers. But Defendant refused to provide this accommodation.

14. As a result, at all times relevant, Defendant was aware of Plaintiff's diagnosis.

15. Despite Defendant's failure to provide examination accommodations, Plaintiff successfully completing her didactic basic science education and passed Part I, without any examination accommodations.

16. And when Plaintiff began her clinical rotations, she was actually on track to graduate earlier in May 2021 and enter the 2021 Couples Residency Match Program (Match) with her spouse.

17. Plaintiff relied upon the May 2021 graduation date both in planning her wedding and in planning to enter the 2021 Couples Match with her spouse, who also attended SMUSOM and was graduating in May 2021.

18. After graduating in May 2021 with an allopathic medical degree, Plaintiff intended to enter post-graduate medical training and complete her Internship and Residency at the same institution and in the same geographic location as her spouse.

19. Because of Plaintiff's known difficulty with standardized testing without examination accommodations, if Plaintiff had either: 1) known at the time of her transfer that Defendant would delay her graduation for several years by arbitrarily increasing the passing score required for a required Pre-test before taking Part II, where SMUSOM requires a Pre-test score 19% higher than the passing score required by the NBME; or 2) that Defendant's advertised Part I and Part II passage rates were artificially elevated because SMUSOM required Pre-test scores that exceeded NBME published scores by 19%, Plaintiff would have gone to another medical school.

20. Notably, despite having other choices about where to complete her allopathic medical education, Plaintiff accepted Defendant's offer of Enrollment based on the readily available and Defendant's promotion of its high Part I and Part II passage rates on its website.

21. By offering enrollment and permitting Plaintiff to transfer, by charging tuition, by accepting tuition payment, by providing basic didactic basic science coursework without exam accommodations, by allowing Plaintiff to take Part I without exam accommodations, by helping Plaintiff arrange her clinical rotations, and by requiring that Plaintiff take a Pre-test before taking Part II, Defendant accepted Plaintiff as one of its medical students.

22. Notably, although Defendant disclosed its requirements that students pass a third party owned and developed pre-test before taking Part II in its

Clinical Medicine Handbook, Exhibit F, Defendant failed to disclose this requirement on the data available to prospective students on its website. And Defendant failed to disclose that its own required Pre-test score exceeded the score required by the NBME by 19%. See Exhibits D and L.

23. And, similar to the USMLE and the ECFMG, Defendant's own official course catalog, Exhibit I page 25 fails to include the Pre-test as a graduate requirement.

24. Defendant itself advertises that its graduation requirements appear to match the ECFMG and not include the CCSE stating:

> **In order to be licensed and practice medicine in the United States, the Educational Commission for Foreign Medical Graduates (ECFMG) requires students to take and pass the United States Medical Licensing Examination (USMLE).**
>
> St. Matthew's University students and graduates are eligible to sit for these exams. The USMLE has three steps, two of which are taken by students while in medical school. Students must take and pass USMLE Step 1 prior to beginning the Clinical Sciences curriculum. USMLE Step 2 Clinical Skills (Step 2 CS) and Step 2 Clinical Knowledge (Step 2 CK) are taken prior to graduation. Step 3 of the USMLE, the final step for licensing, is taken after graduation, during, or at the conclusion of residency training.
>
> Exhibit J Defendant Website FAQS

25. In addition to Plaintiff, upon information and belief, Defendant also delayed or prevented many other from taking Part II based on their failure to achieve

the SMUSOM required pre-test score that exceeded that required by the NBME.

26. Inexplicably, now, after Plaintiff was required to take the Pre-test 6 times where she failed the first time and then passed (according to NBME requirements 5 times, and passed according to SMUSOM requirements once in December 2021) and after successfully having completed all her basic science and clinical science coursework and testing without accommodations, and after passing Part I also without accommodations, Defendant now requested that Plaintiff apply for accommodations before they would allow her to take Part II.

27. However, because Defendant failed to provide any exam accommodations, and because Plaintiff believes she was successful without them, Plaintiff chose not to request accommodations for Part II and Defendant refused to allow that Plaintiff take Part II.

28. By way of general background for medical education in the United States, to earn a degree as an allopathic medical doctor (M.D.) in the United States, after successfully completing a four year undergraduate degree, students must enroll in a four-year medical program where generally the first two years are spent learning basic-sciences in a classroom or online and the last two years consist of clinical, skills based clerkships where direct, supervised medical care is provided. See: Mowery YM. A primer on medical education

in the United States through the lens of a current resident physician. *Ann Transl. Med.* 2015;3(18):270. doi:10.3978/j.issn.23055839.2015.10.19(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4630550/ last accessed November 28, 2022).

29. Between years two and three, before beginning their clinical clerkships, students are generally required to pass Part I, a one-day multiple choice examination testing basic science knowledge related to the first two years of medical school. *Id.*

30. Part II is offered to students who successfully complete their clinical rotations after being certified by that student's medical school. Before the Covid-19 Pandemic, Part Two was a two-day, two-part examination including Part II Clinical Knowledge (Part II CK), a one-day multiple choice examination; and (2) Part II Clinical Skills (Part Two CS), a one-day clinical assessment where medical students evaluate twelve standardized patients. *Id.*

31. After the Covid-19 Pandemic, in-person standardized patient evaluations were paused by the NBME (the designer and publisher of the USMLE_ and now Part II is only a one-day multiple choice examination testing clinical knowledge. See https://www.usmle.org/step-exams (last accessed December 6, 2022).

32. Passing Part II is required to participate an Internship/Residency. And, with few exceptions, most States require between 1 and 2 years of post-graduate medical education in the form of an Internship and/or Residency for licensure.

33. To select an internship or residency position, medical students participate in an online, National Residency Internship Match (Match) program in their fourth year of medical school to determine where they will complete their post-graduate training. *Id.*

34. The National Residency Matching Program (Match) uses a mathematical algorithm to match graduating medical student with available residency and fellowship positions.

   a. The Match occurs once per year generally in March;

   b. Medical students generally apply to the Match in October the year before the Match;

   c. There are strict application deadlines where students like Plaintiff must have been ECFMG certified in February for their Match Year;

   d. Couples may match together;

   e. After applications are received residency and fellowship positions offer interviews to candidates in which they possess an interest;

   f. Students and programs ultimately rank order their choices and are then Matched.

35. In order to complete their training in the same geographic location and the same institution, Couples may enter the Match together; the Couples Match. *Id.*

36. Notably, most Internships/Residencies range between three and seven years with additional time for research and/or for some to earn additional degrees. *Id.* And , some medical sub-specialties require post graduate medical education beyond that typically required for Internships and Residencies in the form of Fellowships which range between one and three additional years. *Id.*

37. When medical students, like the Plaintiff, choose to attend an offshore medical school, like the Defendant, those medical students graduating from foreign medical schools must be certified by the Educational Commission for Foreign Medical Graduates (ECFMG). *Id.*

38. And the ECFMG requires that medical students pass Part I and Part II and have documented proficiency in English by examination or provided that foreign medical schools attest both that its classes were conducted in English and that the student in question is proficient in the English Language.

39. As a native-born United States Citizen speaking English as her primary language, Plaintiff certainly meets this ECFMG language requirement.

40. ECFMG also requires that each foreign medical school attest to its students clinical skills proficiency.

41. Here too, Plaintiff meets this ECFMG requirement based on the plain language of Defendant's own Dean of Clinical Sciences, Dr. Salter. See Exhibit B.

42. With an intended graduation date of May 2021, Plaintiff timely entered the Couples Match but was unable to complete the process because Defendant refused to certify her to take Part II.

43. Plaintiff has now been delayed for at least four years and may only potentially enter the 2024 Match so long as Plaintiff is able to take Part II in later 2023 or early 2024. Defendant slowed, prevented, and frustrated Plaintiff's progress a great deal all while accepting payment for tuition and fees.

44. At this point, because her classes were all held in English, because she is a native English speaker, because she successfully completed both her basic and clinical science coursework and exams, because she passed Part I, because she was found by Defendant's Clinical Dean to be an outstanding medical student, and because she met SMUSOM's Pre-test requirement in December 2021, the only outstanding issue remaining preventing her participation in the Match, graduating, and completing her post-graduate

medical education, and becoming a licensed physician, is Defendant's failure to permit that Plaintiff take Part II.

45. Interestingly enough, whether Plaintiff passes or fails Part II should have absolutely no impact on the Defendant. Because, unless the number of students permitted to take Part II is far less than the number of students enrolled at SMUSOM, even if Plaintiff were to fail, one student should not have any significant statistical impact on SMUSOM's Part II passage rate.

46. Not only is the Pre-test not required by other medical schools in the United States, but under no circumstance does either the USMLE (test designer and publisher) or ECFMG ever require that any student at any medical school take its Pre-test before taking Part II.

47. Here, Defendant engaged in a repetitive pattern where it delayed Plaintiff's graduation date and enlarged the time Plaintiff was required to pay tuition and fees. Not only is Defendant preventing Plaintiff from taking Part II despite meeting all Defendants own conditions precedent to taking Part II, including exceeding an arbitrary Pre-test score of 222 in December 2021, but Defendant also attempted to slow Plaintiff's progress during the required offsite clinical rotations.

48. While medical students in medical schools in the United States generally complete clinical rotations and electives within a two-year period at

hospitals associated with their own medical schools, foreign medical school students are required to return to the United States to arrange and complete their clinical rotations in facilities in the United States.

49. And unlike medical students in the United States that move between regularly scheduled clinical rotations over a two-year window, generally without delay, medical students at foreign medical schools have more challenges locating clinical rotations in the United States and because of location changes, rotation availability, and living arrangements, medical students at foreign medical schools may require more than two years to arrange all required rotations.

50. As a result, these students may end up paying more tuition to for-profit medical schools who rely on this tuition to meet their own budgets.

51. But the Plaintiff was extremely efficient in arranging her own clinical rotations and scheduled them far enough in advance to be able to compete them within two years.

52. Despite Plaintiff's efficiency, Defendant appeared to encourage its students to spend more than two years, and ultimately pay more tuition. Plaintiff recalls meetings where two SMUSOM Clinical Deans visited the Cayman Islands during the last part of her second year to discuss the probability of delays during her last two years of medical school and the likelihood that graduation would be delayed, and ultimately more money paid for tuition

and expenses. Plaintiff believes Defendant intended that its students not graduate on time in order to collect more tuition, fees, and costs.

53. Plaintiff utilized the help of her father, who is involved in academic medicine to help identify, plan, and arrange her clinical rotations in the most effective way possible to minimize gaps and lessen her need to pay excess tuition.

54. But while Plaintiff did everything she could to complete her clinical two years on time to graduate with her husband and enter the Couples Match, Defendant told Plaintiff that she should slow down and not anticipate graduating in four years.

55. For example, Defendant encouraged Plaintiff to give up a clinical rotation that she already identified in New York in favor of another student after Plaintiff already relocated to New York and found housing. When Plaintiff chose to remain and not give up her spot to another less efficient student, Defendant punished Plaintiff by subjecting her to longer intervals between rotations and by altering her schedule such that it would interfere with Plaintiff's known wedding plans.

56. Plaintiff initially scheduled her wedding to another SMUSOM medical student between her 3rd and 4th year. When Plaintiff did not want to give up a New York Rotation to remain on schedule and in a place where she

secured housing, Defendant stated, "Maybe if your priorities were on your medical education, you wouldn't be having these problems (trying to remain on target to graduate in four years and enter the Couples Match).

57. Defendant also frustrated Plaintiff by explaining to her that her clinical rotation preferences were not available because they were only provided to students completing their third year – but Defendant made this statement at a time when Plaintiff was completing her own third year.

58. .Notably, Plaintiff was competitive for the Couples Match and Match in general because despite applying for a position in ten Family Medicine Residency programs without Part II results (required by most programs), on the first day Plaintiff received two offers to interview and was waitlisted for a third interview. Residency interviews are necessary to proceed and are generally only offered to good program candidates. Traditionally most programs do not offer interviews for any candidate not having already successfully taken Part II. But Plaintiff's father provided her with guidance because of his own involvement in academic medical education.

59. To participate in most Internships/Residencies, medical students must generally obtain some form of required state medical licensure. This state licensure generally requires that medical students meet or exceed each

states' criteria for medical licensure. For example, The Florida Medical Practice Act, §§458 *et. seq., Fla. Stat* (2022) requires that those in Internships or Residencies either obtain full medical licensure or obtain a valid Florida training license.

60. For full licensure, since the Plaintiff will not either graduate from an accredited allopathic medical school within the territorial jurisdiction of the United States, §458.311(1)(f)(1.a) *Fla. Stat.* (2022), or from an allopathic medical school accredited by the World Health Organization, §458.311(1)(f)(2.a) *Fla. Stat.* (2022), but will graduate from a foreign medical school like SMUSOM, that Plaintiff must:

a.     Be certified by the Educational Commission for Foreign Medical Graduates (ECFMG), §458.311(1)(f)(3.b) *Fla. Stat.* (2022); and

b.     Pass the examinations required by the ECFMG, *Id.*; and

c.     Complete an approved residency or fellowship for at least two years in one specialty area, §458.311(1)(f)(1.c) *Fla. Stat.* (2022); and

d.     Apply to the Florida Department of Health, pay the required fee, submit fingerprints, and undergo a criminal background check, §458.311(1)(g) *Fla. Stat.* (2022); and

e.     Passed the United States Medical Licensing Examination (USMLE).

61. For a valid Florida training license, pursuant to §458.345 *Fla. Stat.,* since the Plaintiff will not either graduate from an accredited allopathic medical school within the territorial jurisdiction of the United States, §458.311(1)(f)(1.a) *Fla. Stat.* (2022), or from an allopathic medical school accredited by the World Health Organization, §458.311(1)(f)(2.a) *Fla. Stat.* (2022), but will graduate from a foreign medical school like SMUSOM, that Plaintiff must:

a.    Be at least 21 years of age; and (§458.345(1)(a) *Fla. Stat. (2022))*

b.    Not have committed any act or offense which would have prohibited medical licensure (§458.345(1)(b) *Fla. Stat. (2022))*

c.    Is a graduate of a medical school as specified in §458.311(1)(f)

     a    And is certified by the Educational Commission for Foreign Medical Graduates (ECFMG), §458.311(1)(f)(3.b) *Fla. Stat.* (2022); and

     b    Passed Part I and Part II as required by the ECFMG, *Id.;* and

     c    Apply to the Florida Department of Health, pay the required fee, submit fingerprints, and undergo a criminal background check.

62. As a result, because Defendant prohibits Plaintiff's access to Part II, Plaintiff can neither achieve ECFMG certification, nor participate in the Match or in an Internship/Residency program.

**Defendant Arbitrarily & Capriciously Prevented Plaintiff From Taking Part II by Requiring a Pre-test Score 19% Greater than the NBME Required Score**

63. On or about September 12, 2019, after successfully completing SMUSOM's required basic science curriculum and passing Part I, Plaintiff began SMUSOM's required clinical clerkships constituting the remaining portion of Plaintiff's medical education. Exhibit A.

64. Plaintiff successfully completed her clinical clerkships in December 2021 (Exhibits A and B) where SMUSOM's Clinical Dean noted that Plaintiff was an outstanding medical student. (Exhibit B)

65. And although SMUSOM's Clinical Medicine Handbook documented that after completing clinical clerkships, its medical students were required to take a Pre-test (Exhibit F) before taking Part II, SMUSOM failed to publish passing score requirements until June of 2020 (Exhibit L) where SMUSOM's Terrence Reid published a score requirement of 220 (57%, Exhibit C) to pass the Pre-test. In August 2020 SMUSOM's Terrence Reid, without explanation, published an increased score required to pass the Pre-test of 222  (Exhibit L) (59.5%, Exhibit C).

66. Notably the NBME set its passing score as 209 (40.5%, Exhibits C and D) where SMUSOM's score exceeds the NBME passing score by at least 19%.

67. Regardless, of having first failed the Pre-test, in December 2021, Plaintiff exceeded the 222 required by SMUSOM and scored in the 62%; exceeding the passing score required by the NBME by 21.5% and the score required by SMUSOM by 2.5%. *Id.*

68. As a result, Plaintiff met all Defendants published criteria and was on target to take Part II and enter the Couples Match after December 2021.

69. But similar to how Defendant attempted to delay Plaintiff's progress during her clinical rotations, Defendant continued to frustrate Plaintiff and not permit that she take Part II.

70. And, while Defendant lists required remediation for failing the Pre-test, Plaintiff already met all such remediation requirements because although Plaintiff only scored a 208 on her first test, on five subsequent tests Plaintiff exceeded 209. And Plaintiff exceeded 222 and was told that she was eligible for Part Two certification; at least until Defendant changed its mind. And while demanding Plaintiff seek exam accommodations, Plaintiff passed the Pre-test five times according to the NBME and once according to SMUSOM's published criterion score of 222.

71.    Finally, and specifically with regard to remediation, Plaintiff already sought help via two separate and acceptable test preparation services; both having been recommended or approved by Defendant. And both stated that Plaintiff could proceed. Exhibits G and H.

72.    Defendant apparently modified its graduation requirements in 2019 and imposed a Pre-test requirement before allowing its students to take Part II. And these pre-test requirements exceeded the standards set by the ECFMG or the United States Medical Licensing Examination(USMLE). See generally *Estrada* v. *St. Matthews Univ. School of Medicine*, Case 6:20-cv-CEM-EJH. MD. Fla.

73.    Specifically, the student handbook states:

> All students are required to take a Comprehensive Clinical Science Examination (CCSE) [pre-test] to ascertain whether or not his/her preparation for the [Part II] has been successful...Based upon the results of the Pre-test, the student will take [Part II] examination or...If...remediation is needed, additional clinical rotations may be postponed (at the sole discretion of SMUSOM) until the student is scheduled to take the [Part II] examination...If it is determined a student needs additional remediation, the student will enroll in a SMUSOM-approved remediation program... Once satisfactory progress is demonstrated, the student will retake the Pre-test at his/her expense...If a student's performance on the Pre-test in subsequent attempts is deemed deficient, the procedure for remediation described above will be repeated until such time as the student's level of achievement on the Pre-test is deemed satisfactory to the Clinical Department....
> Exhibit F Clinical Medicine Handbook, page 233-34.

74. Importantly, before the USMLE will certify any student such as Plaintiff to take Part II, Defendant must certify that the student (Plaintiff here) completed all USMLE prerequisites to take Part II.

75. Upon information and belief Defendant refuses to certify any student completing all USMLE prerequisites unless and until all students also complete arbitrarily and capriciously imposed addition requirements, such as taking the Pre-test and achieving an undefined score in excess of that required to pass by the exam administration.

76. Like many students in the same situation, Defendant refuses to certify Plaintiff and she is stuck going around in circles with no end in sight; except potentially dismissal from the school.

77. And Defendant continued to demand that not only Plaintiff continue to take the Pre-test while she remains enrolled, continuing to pay tuition and fees, and  participate in Pre-test remediation and continue taking the Pre-test. See Exhibits G and H.

78. Plaintiff participated in the required remediation (*Id.*) and ultimately was forced to file this lawsuit after having attempted to resolve the issues and be allowed to take Part II.

79. At no time did Defendant ever claim or allege that Plaintiff's failure to pass Part II would negatively impact or harm Defendant.

80.     And while Defendant demanded that Plaintiff take more Pre-tests, despite exceeding the published required score to pass in December 2021, Defendant through Drs. Clifton, Reid, and Berardi-Demo told Plaintiff and/or Plaintiff's father that Plaintiff must actually score in the top 2% in the country before they would allow that she take Part II in November 2021 where they required that despite having published a passing score of 222, they actually wanted her to achieve a 260 (or the 98% according to NBME, Exhibit C).

81.     According to the Pre-test designer and publisher a score of 220 is equivalent to 57% (or a student scoring 220 would have done better than 57% of the students that actually took the exam. And a score of 222 would approximately equate to 59.5% or a student achieving a score of 222 would have scored higher than 59.5% of students taking the exam. Exhibit C.

82.     Finally, a score of 260 would equate to the 98%. And requiring the Plaintiff to achieve a score of 260 would mean that the Plaintiff would have to be in the top 2% of all students taking the exam having scored higher than 98% of all other students. *Id.*

83.     But See Exhibit L. Defendant's Terrence Reid sent an email to students on June 8, 2020, stating:

> [Part II] Certification Process

> Students are required to pass the [Pre-test] as defined by the university. Currently the passing [Pre-test] score is 220...
>
> After successfully passing the [Pre-test] a portfolio containing the Basic Science exam scores and GPA, [Part I] and Clinical Science exam scores will be forwarded to the school's certification committee for consideration of [Part II] certification.
>
> Exhibit L

84.   Inexplicably, less than three months later, on August 31, 2021, Defendant through Terrence Reid increased its required Pre-test score for those not certified to take Part II to 222 effective August 31, 2020. *Id.*

85.   Regardless, while few if any accredited medical schools actually require the Pre-test, like SMUSOM, the NBME only claims that the Pre-test provides predictive value for those that will more likely pass Part II. And the passing score published by the NBME is 209 or 40.5%, 19% less than that required by Defendant SMUSOM.

86.   By setting an artificially higher standard for passing a Pre-test that counts for nothing other than its predictive value for passing Part II, Defendant artificially increases is percentage of first time Part II test takers passing Part II. And Defendant utilizes this artificially high standard in advertising itself to prospective medical students online.

87.   And, given Plaintiff's experience with Defendants having attempted to delay her clinical rotations and also publishing a Pre-test score  passing

requirement exceeding the NBME rate by 19%, and then actually telling the Plaintiff by phone that she needed to exceed the NBME required score by 57.5%, it appears to Plaintiff that Defendant's actions were arbitrary and capricious; especially since, at worst, Plaintiff's potential failure on Part II would not impact Defendant to any reasonable extent.

88.   Initially, Plaintiff requested to take the Pre-test early. Plaintiff believed that taking the Pre-test early would provide her with a sense of how she was doing clinically because of difficulties taking past exams. However, before taking the Pre-test early, Plaintiff was concerned about any repercussions related to failure and contacted Dr. Reid to inquire about any potential penalties. Plaintiff relied on Dr. Reid's statement that there would be no penalties except that Plaintiff would have to pay to take the exam again.

89.   And when she was not successful on her first CCSE exam in July 2021 after scoring 208 with a published pass cut-off score of 209, Plaintiff paid for and actively participated in a review course with Elite Medical Prep in August 2021. Exhibits D and G.

90.    During a call with Defendant (Dr. Clifton), who was seemingly unaware that Defendant had already utilized Elite Medical Prep, Defendant

recommended that Plaintiff utilize Elite Medical Prep, admitting that it was an approved remediation test preparer.

91.   In August 2021, after successfully completing a month of 1:1 tutoring with Elite Medical Prep., Exhibit G Elite Medical Prep., on September 2, 2021, Plaintiff took the Pre-test for the second time and passed, scoring 211, where a passing score was 209. But Defendant refused to certify Plaintiff to take Part II.

92.   It was this period in Fall 2021, that Plaintiff along with her father (an academic physician in Ohio), met telephonically with Defendant (Dr. Clifton) twice. During the second meeting, Drs. Reid and Berardi-Demo joined Dr. Clifton. No remediation plan was provided, and Defendant suggested that to move forward, Plaintiff would have to score at least 260 on the Pre-test (98% per Exhibit C or top 2% of all test-takers).

93.   Plaintiff continued to study and prepare independently and at Defendant's insistence ended up taking and passed the Pre-test three more times (October 2021, December 2021, and May 2022) yet Defendant still refused to certify Plaintiff to take Part II.

94.   Most importantly, on December 18, 2021, Plaintiff scored 223 on the Pre-test exceeding Defendant's published required passing score of at least 222. Exhibit L.

95.   And Defendant still failed to allow that Plaintiff take Part II.

96.   At Defendant's insistence, Plaintiff complied with SMUSOM required

remediation and paid for a second approved professional test prep

program, STATMed. STATMed informed Defendant on July 5, 2022, that:

> [Plaintiff], a fourth-year student at the St. Matthews School of
> Medicine…successfully completed our STATMed Boards
> Workshop for students, a one-on-one platform where we help
> self-identified "bad test-takers" at the medical boards level
> learn how to consistently show what they know on board
> exams. [Plaintiff] was a model client for the Boards Workshop
> due to her ADHD diagnosis and issues with
> reading…[Plaintiff] was a model student and got a great deal
> from the workshop.  I was very impressed with her overall
> and expect her to do great things with the tools taught to her
> once she has had time to train with them and implement
> them. She is now poised to train independently moving
> forward as she prepares for her USMLE Step 2.
> Exhibit H STATMed

97.   And Defendant still refused to permit Plaintiff to take Part II.

98.   Defendant's refusal to allow that take Part II actually and proximately

damaged Plaintiff in that she was:

a.   Prevented from participating in the 2021 Couples Match with her

husband despite having received some assurance(s) that they were

both competitive for at least one particular program together;

b.   Prevented her from participating in the 2022 Match;

c.   Prevented her from participating in the 2023 Match;

d.  Or will be prevented from participating in any Match until she is certified to take Part II;

e.  Threatened with being removed as a student for remaining too long; and

f.  Threatened with disciplinary action when Plaintiff tried to change clinical clerkships with another student and suggesting that that was not professional when Defendant itself unsuccessfully tried to force Plaintiff to trade a clerkship with another student or be punished by being assigned to a geographic area where Plaintiff had no housing or family.

g.  Now being forced to repay her student loans and not being allowed to forebear payment because she is not in an Internship/Residency and because SMUSOM reported Plaintiff for not being a full-time student; and

h.  Generally Damaging Plaintiff's Residency Match and future employment prospects by not allowing her to graduate within the expected time of four years which will be looked at in a negative light by Internship and Residency Programs, by State Licensure

Boards, by third party payors, and by virtually all medical facilities where she might ever want to obtain clinical privileges; and finally.

i.    By totally voiding all the tuition and fees and costs Plaintiff has aid for a medical education that she will not be able to use.

99.   Notably despite Defendant's past threats and overt hostility, Plaintiff excelled academically during her tenure at SMUSOM, participated in community service, while managing time to do research and publish. Exhibit E.

100.  Defendant's own Dean of Clinical Sciences evaluated Plaintiff, Exhibit B, stating (**emphasis added**)

> **[Plaintiff's] steadfast and focused commitment to the study of medicine is reflected by her tenacious and successful completion of her education despite multiple events of adversity.** These include the devastation of Sint Maarten Island due to Hurricane Irma in 2017 and her proactive efforts to maintain academic progress in clinical clerkships during the COVID-19 pandemic.

> **[Plaintiff] exemplified maturity and dependability during her clinical rotations. She fulfilled her responsibilities in an exceptional manner.** This was reflected when she was the sole medical student at times in the NICU during her Pediatrics rotation. In addition, she was one of two students who chose to stay at the end of her OB/GYN rotation to help with high patient volume in the clinic, and she was the medical student most often relied upon for emergency operations during her Surgical rotation.

> **[Plaintiff] embodies poised leadership as reflected in
> her work as a research associate at** Nationwide
> Children's Hospital in Columbus, Ohio. As part of the
> Genetics team working with cardiac anomalies, Danielle
> was responsible for critical, time-sensitive milestone
> checks as the patient was undergoing surgery. As an
> integral part of the surgical team, she was the single
> point of accountability providing confirmatory test
> results within minutes and a recognized leader.
> Exhibit B

101.   With the exception of retaking the Internal Medicine Shelf exam on one

occasion, during one clinical rotation, at no time was Plaintiff required to

repeat or otherwise remediate any other clinical coursework during her

medical education. *Id.* page 2.

102.   At no time was Plaintiff the recipient of any adverse action(s) by the

Defendant. *Id.*

103.   And with regard to her professional performance, the Dean of Clinical

Sciences also wrote (**emphasis added**):

> **[Plaintiff] met all the stated objectives for professionalism at
> St. Matthew's University School of Medicine.** Throughout
> their medical school education, we have assessed all students'
> commitment to the highest standards of professional
> responsibility, adherence to ethical principles, and sensitivity
> in all interactions with patients, families, colleagues, and
> others with whom physicians must interact in their
> professional lives. More specifically, each SMU student is
> expected to: show compassion in the treatment of patients and
> respect for their privacy, dignity and beliefs; demonstrate
> personal integrity, ethical behavior and altruism; exhibit
> dependability and responsibility; acknowledge and accept the
> limitations in his or her knowledge and clinical skills;
> demonstrate the ability to deal with uncertainty; demonstrate

> skills in effectively reconciling conflicts; demonstrate the
> ability to identify and utilize effective personal coping
> strategies; and develop sensitivity to discuss the ethical issues
> involved in clinical practice and the use of human subjects...
> *Id.*, pages 2-3.

104. And the Dean of Clinical Sciences confirmed Plaintiff's transcript that the Plaintiff successfully completed the Basic Science portion of her medical education. *Id.*, page 3.

105. Not only did the Dean of Clinical Sciences indicate that Plaintiff completed her clinical clerkships and electives with all "Honors" and "High Pass" grades, but that Plaintiff's cumulative grade point average (GPA) met or exceeded those of her colleagues in most cases. *Id.*, page 7.

106. In summary, Defendant's Dean of Clinical Sciences concluded that Plaintiff was, "a truly outstanding student in every way, " and (**emphasis added**):

> **[That Plaintiff] has proven to herself and to others that she is
> a highly capable student who is focused and performs well
> in all circumstances. She has demonstrated an
> understanding and proficiency in each of our school's core
> competencies. She has earned high praise in all of her
> clinical rotations and demonstrated overall excellence
> relative to her peers.** Based on her documented strong past
> summative and formative evaluation performance,
>
> [Plaintiff's] CV is outstanding for any medical student. Her
> gene therapy research experience was impressive. I love how
> well rounded she is. Anyone who has the experience in
> coaching that Plaintiff has, understands team dynamics.
> Almost universally that translates into how these students

function in a residency program. Plaintiff was in my online course (transition to residency) during COVID when the core hospitals were closed to students. She was always prepared, engaged in the discussions and provided perspectives that were quite different from her classmates. I enjoyed having her in my class. **I predict that she will carry these strengths into her residency training and contribute greatly to the program, her colleagues, her teachers and her patients. [Plaintiff's] transcript documents that she is a truly outstanding student in every way.**
*Id.*

107. But for Defendant's inexplicable refusal to certify Plaintiff to take Part II, because Plaintiff was a very competitive candidate for the 2021 Match, Plaintiff has now been forced to delay her post-graduate education, pay fees, costs, tuition, and living expenses, and remains unable to enter the Match.

108. At this time, it is neither reasonable nor practical for Plaintiff to transfer to another medical school. And, given the Defendants past history of dismissing students,

109. If Defendant does not certify Plaintiff, Defendant will dismiss Plaintiff and effectively end her medical career. And Plaintiff will still have to repay all the federal loans issued on her behalf to pay Defendant. Notably, at this point, because Defendant no longer lists Plaintiff as a full-time student, Plaintiff is liable to begin repaying her student loans that were paid to Defendant.

110. Plaintiff should have graduated in May 2021 ago given her transfer status and anticipated graduation date where the delay has been caused by Defendant.

111. To date, Plaintiff paid Defendant $451,218.00 in tuition, fees, and costs and expended in excess of $59,177.96 in housing, room and board totaling $510,395.95. And Plaintiff is now being forced to begin repaying her student loans.

112. Defendant's failure to permit that Plaintiff progress, after having paid required that Plaintiff retain undersigned attorney to represent here interests and Plaintiff is obligated to pay a reasonable fee for such services.

113. Defendant failed to allow any further administrative remedies despite Plaintiffs having sought them and all other conditions precedent to suit have been met, waived, or otherwise excused.

114. Finally of note, while Defendant states that it only charges for five semesters of tuition for required clinical rotations and electives, but this does not appear to be the case. Exhibit M.

<u>**Count I: Defendant's Breach of Contract**</u>

115. Plaintiff restates paragraphs 1-114 and further states:

116.   The Clinical Medicine Handbook, Exhibit F, constitutes a valid, binding, explicit contract between Defendant School and Plaintiff Student.

117.   Defendant materially breached the terms of it is contract by failing to certify Plaintiff and allow her to take Part II.

118.   Defendant's failure to permit Plaintiff to progress actually caused harm to the Plaintiff.

119.   Specifically, Plaintiff applied to Defendant relying upon Defendant's published assertions online, Defendant accepted Plaintiff as a medical student. Plaintiff attempted to comply with Defendant's requirements including successfully completing basic and clinical science coursework, Passing Part I, and performing all other required acts, including exceeding a score of 222 on the Pre-test. Yet Defendant failed to perform and permit that Plaintiff take Part II. Notably, whether Plaintiff pass or fail Part II should have absolutely no impact on Defendant.

## Count II: Defendant's Breach of an Implied Covenant of Good Faith and Fair Dealing

120.   Plaintiff restates paragraphs 1-114 and further states:

121.   Plaintiff Student and Defendant School are parties to a clearly defined, written contract, Exhibit F, The Clinical Medicine Handbook.

122.   This contract was neither negotiated nor were any negotiations permitted by Defendant. It was unilaterally drafted, containing hidden

ambiguous terms that purport to allow Defendant to unilaterally, arbitrarily, and capriciously delay a student's progress according to Defendants own whim.

123.   Defendant intentionally, deliberately, and consciously acted, or failed to act in the performance of its responsibilities and duties, inextricably causing delay, hardship, expense,  and frustrating Plaintiff's intent according to the contracts own purpose and ultimately prohibiting Plaintiff's success.

124.   Defendants breach of an implied covenant of good faith and fair dealing in the provision of a medical education and permitting students who successfully meet ECFMG guidelines to graduate and proceed forward with their graduate medical education, actually harmed the Plaintiff and all similarly situated students.

**Count III: Defendant's Fraudulent, Deceptive, and Unfair Trade Practices**

125.   Plaintiff restates paragraphs 1 – 114 and further states:

126.   Pursuant to the Florida Deceptive Trade and Unfair Trade Practices Act §§ 502 *et. seq., Fla. Stat.* (2022), Defendant is a for-profit medical school intent on benefiting its shareholders at the expense of the students it purports to educate.

127.   :Pursuant to its website, in addition to limited scholarships, Defendant was approved to participate in the United States William D. Ford Federal

Direct Unsubsidized Stafford and the Federal Direct Grad PLUS Loan programs administered by the United States Department of Education. Exhibit K.

128. Defendant advertises throughout the North America and in Florida, see https://www.stmatthews.edu, and uses its website and downloadable materials to misinform and deceive potential students and transfer students about its graduation requirements. See also Exhibit I referencing ECFMG requirements but containing no mention of having to take the CCSE and potentially far exceed any passing score required by the test administrators.

129. Defendant advertises high Part I and Part II passage rates but fails to advertise that it requires that students take a pretest and achieve some number obviously in excess of what the test administrators require.

130. By arbitrarily requiring that Students exceed the CCSE test administrator's passing score, Defendant delays Plaintiff and all similarly situated students from completing their education imposing additional fees, tuition, courses, and other expenses. Notably Defendant profits from their own mandated delay.

## Count IV: Fraud

140.     Plaintiff restates paragraphs 1-114 and further states:

141. Defendant's false statements of material fact and misrepresentations about its testing and graduation requirements induced Plaintiff to transfer to Defendant's medical school, relocate, enroll, pay tuition, and actively work towards a successful completion of her medical degree.

142. Pursuant to *Brooks* v. *Blue Cross & Blue Shield,* 116 F. 3d 1364, 1371 (11th Cir. 1997):

    a.  Specific statements, representations, and/or omissions:

        i.  As alleged in paragraph 17, "Notably, although Defendant disclosed its requirements that students pass a third party owned and developed pre-test before taking Part II in its Clinical Medicine Handbook, Exhibit F, Defendant failed to disclose this requirement on the data available to prospective students on its website. Exhibit L.

        ii.  Defendant never provided any statement that it required a Pre-test before taking Part II on its website or anywhere where prospective students would learn of this requirement.

       iii.  And when Defendant did actually discuss a Pre-test requirement in its student handbook, it provided

vague language that did not include the score required to pass.

iv. And as noted above, Defendant sent its students a series of Emails, changing the Pre-test score required to pass seemingly at will. See paragraphs 66 and 67 above where Estrada alleged in his complaint that SMUSOM arbitrarily and capriciously changed is Pre-test passing score cut off at will. See *Estrada* v. *St. Matthews Univ. School of Medicine,* Case 6:20-cv-CEM-EJH. MD. Fla. And see the student handbook: Specifically, the student handbook which states:

> All students are required to take a [pre-test] to ascertain whether or not his/her preparation for the [Part II] has been successful…Based upon the results of the Pre-test, the student will take [Part II] examination or…If…remediation is needed, additional clinical rotations may be postponed (at the sole discretion of SMUSOM) until the student is scheduled to take the [Part II] examination…If it is determined a student needs additional remediation, the student will enroll in a SMUSOM-approved remediation program... Once satisfactory progress is demonstrated, the student will retake the Pre-test at his/her expense…If a student's performance on the Pre-test in subsequent attempts is deemed deficient, the procedure for remediation described above will be repeated until such time as the student's level of achievement on

the Pre-test is deemed satisfactory to the
Clinical Department....
Exhibit F Clinical Medicine Handbook, page 233-34.

v.  Notably no actual score is published. Rather the school
sent emails with increasingly greater cut off
requirements to pass. See paragraph 62, "Inexplicably,
Defendant altered this rate to require 220 and then later
to require 222.  And Defendant communicated to
Plaintiff that she required a score of 260 or that she would
not move on." See Exhibit L and paragraph 63.

vi.  And see paragraph 77 where SMUSOM met
telephonically during Covid-19 with Plaintiff and her
father, who is an academic physician involved in medical
education where, "Plaintiff and her father met with
Defendant (Dr. Clifton) twice. During the second
meeting, Drs. Reid and Berardi-Demo joined Dr. Clifton.
No remediation plan was provided, and Defendant
suggested that to move forward, Plaintiff would have to
score at least 260 – far in excess of the E-mail published
222.

vii.  By accepting Plaintiff as one of its students, Defendant
essentially agreed to allow her to progress, and graduate

provided she met Defendant's graduation requirements. And Defendant itself admitted, through its Clinical Dean that Plaintiff was an outstanding Medical Student that not only successfully completed all of her required didactic basic science coursework, without any exam accommodations, but she also passed Part I without exam accommodations, and then received excellent evaluations during all her clinical rotations – also without any accommodations. Plaintiff's only apparent failure is not passing one Pre-test one time before successfully exceeding the Pre-test developer and publisher's passing score requirements five times and SMUSOM's own published pass score once – in December 2021! All while SMUSOM collected additional tuition and fees.

viii.   And as noted above, and in Exhibit C, while the Pre-test designer and publisher require that students score at least in the 40.5% to likely pass Part II, Defendant actually first required a score of 220 (or 57%) and then a score of 222 (or 59.5%) to be certified to take Part II.

b. <u>Time and place of each statement, representation, and/or omission:</u>

    i. The Emails, Exhibit L, from Terrence Reid on June 8, 2020, and August 31, 2020.

    ii. The telephonic discussions between Plaintiff and Defendant through Dr. Clifton before November 2022 wherein Dr. Clifton discussed Plaintiffs Pre-test scores and that they needed to be higher.

    iii. The telephonic discussions with the Plaintiff and her father by telephone that involved Drs. Clifton, Reid and Berardi-Demo in November 2022 – long after Plaintiff exceeded the Pre-test score of 222 in December 2021. Where now Defendant claimed that to move forward Plaintiff required a score of 260 or one in the top 2% of all test takers where her score would have to exceed 98% of all other test takers – see Exhibit C

    iv. See also Exhibit D, Plaintiff's Pre-test results where the score required for passing was only 209.

c. <u>Content of such statements, representations, and/or omissions</u>

i. When Plaintiff chose to transfer to Defendant, Defendant never directly informed Plaintiff that there was a Pre-test requirement before she could graduate or take Part II.

ii. When Plaintiff chose to transfer to Defendant, Defendant published online that 92% of its students passed Part I (and Plaintiff did) and that 94% of its students passed Part II.

iii. See also paragraph 10 above, where Defendant essentially bragged about is first time test taker passage rates for Part I (92%) and Part II (94%) but omitted the Pre-test requirement and that the certification to take Part II was ambiguous at best and based upon subjective guidelines.

iv. Too, see Exhibit L, Dr. Reid, "…a portfolio containing Basic Science exam scores and GPA, [Part I] score(s) and Clinical Science exam scores will be forwarded to the schools certification committee for consideration of [Part II] certification." June 8, 2020, by Email to SMUSOM students including the Plaintiff.

d. <u>What Defendants obtained as a consequence of the fraud:</u>

i. By failing to inform its prospective students about its Pre-test requirement and

ii. By failing to comply with its own published passing score requirements for the Pre-test,

iii. Defendant improperly collects more semesters of tuition, fees, and costs from its students by requiring that they remain in school longer.

iv. Defendants are also using their first-time test taker pass rates to artificially inflate their Part II pass rates as a means of further advertising to entice more students to enroll.

v. A cursory review of Exhibit D indicates that Plaintiff exceeded the Pre-test designer and publisher's passing score of 209 on 5 occasions. And Plaintiff even scored in excess of the 222 published by Dr. Reid on behalf of Defendant in December 2021. Yet Defendant still failed to allow Plaintiff to take Part II , enter the Match, and graduate.

143. Defendant knew its online advertised statements about first time Part II passage rates, along with its failure to openly discuss its own Pre-test requirement that exceeded the Pre-test designer and publisher's own passing score requirement and Defendant's failure to allow Plaintiff to advance despite exceeding Defendant's published Pre-test score materially misrepresented the Plaintiff's chance of successfully

completing her degree and moving onto her post-graduate medical education.

144. Defendant knew it misrepresented its Part II results because it artificially increased the score required to take Part II and self-selected a greater percentage of students, but smaller number, actually taking Part II because their Pre-test scores were significantly than those from other medical schools using the Pre-test.

145. Except for its Clinical Medicine Handbook, Defendant failed to include reference to any Pre-test requirement online or in Defendant's own official course catalog, Exhibit I.

146. And Defendant itself advertises that its graduation requirements match the ECFMG and fail to include the Pre-test stating:

**In order to be licensed and practice medicine in the United States, the Educational Commission for Foreign Medical Graduates (ECFMG) requires students to take and pass the United States Medical Licensing Examination (USMLE).**

St. Matthew's University students and graduates are eligible to sit for these exams. The USMLE has three steps, two of which are taken by students while in medical school. Students must take and pass USMLE Step 1 prior to beginning the Clinical Sciences curriculum. USMLE Step 2 Clinical Skills (Step 2 CS) and Step 2 Clinical Knowledge (Step 2 CK) are taken prior to graduation. Step 3 of the USMLE, the final step for licensing, is taken after graduation, during, or at the conclusion of residency training

Exhibit J Defendant Website FAQS

147. Ultimately only permitting those higher Pre-test scoring students to take Part II resulted in a higher passing rate than would be expected – something advertised and used to recruit new and transfer medical students.

148. Defendant had to know that its misrepresentations about first time test takers would induce the Plaintiff and others to transfer to a school whose students appeared to be doing so well on required standardized testing. that appeared to be doing so well with such great Part II passage rates.

149. Plaintiff did not know that Defendant misrepresented its testing and graduation requirements. Until it was too late, Plaintiff had no idea that SMUSOM even  required a Pre-test or that the required score on that Pre-test significantly exceeded the score recommended by the test designer and publisher.

150. Plaintiff and likely  other students  acted in reliance upon Defendant's false statement and suffered damages and harms.

### Count V: Declaratory Judgment

151. Plaintiff restates paragraphs 1-114 and further states:

152. Pursuant to 28 U.S.C. §§2201-2202, Plaintiff respectfully requests that this Court enter a declaratory judgment finding:

a. Defendant engaged in trade or commerce supplying goods and services;

b. Plaintiff is a consumer of Defendant's goods and services.

c. Defendant falsely represented to incoming students and transfer students requirements for graduation and licensure;

d. Defendant used such false representations to induce students to pay substantial sums, generally far in excess of those for medical schools located within the United States, by borrowing large sums from the United States and/or other third parties;

e. Defendant altered and applied its graduation requirements in an arbitrary and capricious manner with different standards for different students;

f. Under the guise of providing a medical education, Defendant engaged in otherwise prohibited acts;

g. Defendant violated its obligations of good faith and fair dealing with its students;

      h.  Defendant unnecessarily delayed its own students' progress forcing them to remain in school longer.

      i.  Defendant will cause irreparable harm to Plaintiff by failing to allow her to even attempt passage of Part Two CK.

153.    There exists a *bona fide*, actual, present, and practical need for this declaration.

154.    The facts underlying this declaration are ripe, easily ascertainable, and a declaration will resolve aa present controversy.

155.    Plaintiff seeks relief and not merely this Court's provision of legal advice.

156.    All antagonistic and adverse interests are before the Court or will be following proper process.

157.    Defendant possesses a clear, actual, present, adverse, and antagonistic interest in the subject matter in fact or in law.

158.    The facts or law applicable to the facts of this case require this declaration to resolve Plaintiff's rights, powers, and privileges and the Defendant's liabilities or duties.

## Count VI: Injunctive Relief

159.    Plaintiff restates paragraphs 1-114and further states:

160.    Plaintiff seeks injunctive relief to prohibit Defendant from taking any adverse action against her or from dismissing her from school for all the aforementioned reasons.

161.    It is likely that Plaintiff will succeed on the merits because given the allegations above and considering:

a.    Plaintiff successfully completed and performed her basic science coursework (Exhibit A) better than many of her peers and passed Part One of the USMLE even after Defendant denied Plaintiff reasonable exam accommodations;

b.    Plaintiff performed exceptionally well according to the Dean of Clinical Sciences (Exhibit D) during her clinical clerkships and electives.

c.    Plaintiff passed five consecutive pre-tests (CCSEs) pursuant to the pass-fail cut off published by the test administrator without exam accommodations; and

d.    Plaintiff completed two separate exam tutoring programs,

e.    Neither the ECFMG nor the USMLE require passage of the CCSE, a pretest with absolutely no impact on future licensure or performance;

    f.    Defendant falsely advertised that it followed ECFMG guidelines that do not actually include the CCSE.

161. Plaintiff is suffering and has suffered irreparable harm because no damage award could possibly:

    a.    Return the year she's lost trying to meet Defendant's unending, impossible, and ambiguous guidelines;

    b.    Allow her to participate in the Couples Match when her husband matched two years ago in 2021;

    c.    Provide any recompense for the explanation, time, and difficulty that she will endure each and every time she applies for licensure, certification, or privileges with any state, insurer, or facility where she will have to explain her graduation's delay and her failure to progress like any other medical student.

    d.    Despite claiming that its students find a wealth of Match opportunities at top post-graduate training programs in the United States, Defendant's actions will adversely impact and may reasonably prevent Plaintiff from Matching with any desirable position.

163. Plaintiff's injuries far outweigh any potential harm to Defendant. Because Plaintiff's is harmed by Defendants failing to certify Plaintiff and allow her to take Part Two CK, a pretest but not an actual test that counts for anything other than as a possible predictor of passing Part II.

   a. The worst that could happen is that Plaintiff could fail Part II and have to undergo remediation as provided.

   b. The harm in not allowing any student such as the Plaintiff to take Part II, and possibly fail, is totally inexplicable when that student would not be able to graduate without having passed Part II.

   c. The only potential for harm is to the Plaintiff and there is no possibility of harm to Defendant.

   d. Defendant could potentially argue that a high failure rate for Part II might potentially impact its advertising, but its website did not provide actual percentage passage rates until recently where it now advertises a pass rate for Part I of 92% and a pass rate for Part II of 94%.

   e. Here the non-economic irreparable and actual economic harm being inflicted upon the Plaintiff by the Defendant far outweigh the absence of any potential harm to the

Defendant by merely allowing the Plaintiff to take an exam for which she has been preparing an inordinate length of time.

164. An injunction requiring that Defendant certify that Plaintiff be allowed to take Part II would serve the public interest because:

a. If Plaintiff successfully takes Part Two CK, graduates, and purees her intended Family Medicine Residency, Plaintiff will actually serve the public interest by providing needed primary care physicians;

b. If Plaintiff fails Part Two CK, she will remain in school pursuant to the remediation guidelines that are in place. And there is no risk of harm to the public because as a medical student, Plaintiff will be heavily supervised at all times;

c. While there exist sparse data about whether Part II passage has any relationship to actual clinical care and there is no reason to suspect that Plaintiff will harm the public because according to Defendant's Dean of Clinical Studies:

> [Plaintiff] has proven to herself and to others that she is a highly capable student who is focused and performs well in all circumstances. She has demonstrated an understanding and proficiency in each of

our school's core competencies. She has earned high praise in all of her clinical rotations and demonstrated overall excellence relative to her peers. Based on her documented strong past summative and formative evaluation performance...I predict that she will carry these strengths into her residency training and contribute greatly to the program, her colleagues, her teachers and her patients. **[Plaintiff's] transcript documents that she is a truly outstanding student in every way**.

Exhibit B Dean of Clinical Studies

d.  Injunctive relief would not only serve those in the general public considering enrolling in medical school but all those desiring  to find clear, honest, unambiguous information posted by educational institutions about those schools and their graduation requirements.

e.  Injunctive relief will require that Defendant honestly present its graduation requirements to the general public before enrollment occurs and before governmental funds are borrowed.

f.  Finally, given widespread negative coverage of for-profit medical institutions, the public interest will also be served by requiring that Defendant and those of similar ilk, themselves comply with and honor the explicit terms of

unambiguous if unilaterally drafted contracts with their student consumers.

### Prayer for Relief

Wherefore, because: (1) Plaintiff successfully completed her basic science coursework (Exhibit A) with Defendant and passed Part One of the USMLE; (2) Plaintiff performed exceptionally well according to the Dean of Clinical Sciences (Exhibit D) during her clinical clerkships and electives; passed five consecutive pre-tests (CCSEs) pursuant to the pass-fail cut off published by the test administrator without exam accommodations; (3) Plaintiff excelled in her basic sciences without Defendants having approved exam accommodations for Plaintiff; and (4) Plaintiff completed two separate exam tutoring programs, Plaintiff Danielle Gegas respectfully requests that this Court:

I. Injunctive Relief:

1. Enjoin and prevent Defendant from dismissing Plaintiff until she is able to take Part II and successfully graduate from Defendant's medical school;

2. Enjoin and require that Defendant certify Plaintiff to the ECFMG and allow Defendant to take Part II

3. Enjoin and require that Defendant permit Plaintiff to complete any remaining coursework, and take any other necessary exams to permit graduate;

4. Enjoin and require that Defendant allow Plaintiff to successfully graduate unless Plaintiff is not able to meet exam passage criteria determined by unrelated third-party testing administrators administering their own such testing (i.e., USMLE pass requirement for Part II).

5. Enjoin and require that Defendant assist Plaintiff with entering the Match closest in time to her graduation, help identify a family medicine residency program, and help explain Plaintiff's delay using a mutually agreeable explanation.

6. Enjoin and require that Defendant allow Plaintiff to graduate and confer her medical doctor degree.

7. Enjoin and require that after Defendant graduates Defendant provide, on demand at any time, evidence of Plaintiff's having successfully graduated from Defendant's medical school.

8. Finally enjoin Defendant from making, publishing , or advertising any negative, defamatory, or libelous statements about Plaintiff.

9. Award any other applicable relief deemed proper by the Court.

II. Breach of Contract Relief:

1. Find that a valid contract existed;

2. Find that Defendant materially breached the contract resulting in economic and non-economic harm to the Plaintiff

3. Award economic damages to the Plaintiff with prejudgment interest and costs.

4. Award non-economic damages to the Plaintiff with pre-judgment interest and costs.

5. Award any other applicable relief deemed proper by the Court.

III. Breach of Implied Covenant of Good Faith and Fair Dealing Relief:

1. Find that Defendant possessed a Covenant of Good Faith and Fair Dealing with Plaintiff.

2. Find that Defendant breached that Covenant of Good Faith and Fair Dealing with Plaintiff.

3. Award economic damages to the Plaintiff with pre-judgment interest and costs.

4. Award non-economic damages to the Plaintiff with pre-judgment interest and costs.

5. Award any other applicable relief deemed proper by the Court.

IV. Relief from Defendant's Fraud:

1. Find that Defendant possessed a Covenant of Good Faith and Fair Dealing with Plaintiff.

2. Find that Defendant breached that Covenant of Good Faith and Fair Dealing with Plaintiff.

3. Award economic damages to the Plaintiff with prejudgment interest and costs.

4. Award non-economic damages to the Plaintiff with prejudgment interest and costs.

5. Award any other applicable relief deemed proper by the Court.

V. Relief from Deceptive Trade and Unfair Practices:

1. Find that Defendant violated the Deceptive Trade and Unfair Practices Act §§501 *et. seq., Fla. Stat.(2022)* by misrepresenting graduation requirements; and

2. Find that Defendant violated the Deceptive Trade and Unfair Practices Act §§501 *et. seq., Fla. Stat.(2022)* by unfairly impeding Plaintiff's progress towards graduation and licensure; and

3. Award economic damages to the Plaintiff with prejudgment interest and costs.

4. Award non-economic damages to the Plaintiff with prejudgment interest and costs.

5. Awarding Attorney's Fees and Costs as permitted.

6. Award any other applicable relief deemed proper by the Court.

VI. Declaratory Relief finding:

1. Plaintiff is a consumer of Defendant's goods and services.

2. Defendant falsely represented to incoming students and transfer students requirements for graduation and licensure;

3. Defendant used such false representations to induce students to pay substantial sums, generally far in excess of those for medical schools located within the United States, by borrowing large sums from the United States and/or other third parties;

4. Defendant altered and applied its graduation requirements in an arbitrary and capricious manner with different standards for different students;

5. Under the guise of providing a medical education, Defendant engaged in otherwise prohibited acts;

6. Defendant violated its obligations of good faith and fair dealing with its students;

7. Defendant unnecessarily delayed its own students' progress forcing them to remain in school longer.

8. Defendant failed to timely allow Plaintiff to graduate with her degree.

9. Defendant will cause irreparable harm to Plaintiff by failing to allow her to even attempt passage of Part Two CK.

## Demand for Jury Trial

Plaintiff respectfully requests a trial by jury on all issues so triable.

## Exhibit List:

Exhibit A:   Plaintiff Transcript at SMUSOM and Part I Passing Score

Exhibit B:   Defendant's Dean Dr. Salter Medical Student Performance Evaluation of Plaintiff

Exhibit C:   Pre-test explanation and Score Evaluations

Exhibit D:   Plaintiff Pre-test scores

Exhibit E:   Plaintiff *Curriculum Vitae*

Exhibit F:   SMUSOM Clinical Medicine Handbook

Exhibit G:     Letter to SMUSOM for Plaintiff from ELITE Medical Prep

Exhibit H:     Letter to SMUSOM for Plaintiff from STATMed Test Prep

Exhibit I:     SMUSOM Official Catalog 2022-2024

Exhibit J:     Frequently Asked Questions SMUSOM

Exhibit K:     SMUSOM Financial and Loan Policy

Exhibit L:     Defendant Email to Plaintiff Pre-test passing score required.

Exhibit M:     Plaintiffs Financial Account Statement for SMUSOM

**Petitioner's Verification**

State of Indiana                          )
                                         )
County of Hamilton                       )
                                         )

The undersigned, Danielle Gegas, Petitioner, being first duly sworn, states that she

has read the above Amended Complaint and its attached Exhibits, and has read

the originally filed Complaint and its attached Exhibits, knows the contents

contained within each document filed with the Court, and that all the statements

contained in each of these documents are true and correct to the best of her

knowledge and belief.

**Dated this 1ˢᵗ Day of September 2023**

Petitioner, Danielle Gegas

Notary Signature: _____

Notary Name: _Lisa M. Parsley_

Notary Expiration Date: _May 30, 2024_

Notary Seal:



Lisa M. Parsley
Notary Public, State of Indiana
Hendricks County
Commission Number 656044
My Commission Expires
May 30, 2024

Gegas v. St. Matthews Amended Verified Complaint          061

## Certificate of Service

I certify that on this date I electronically filed the foregoing with the Clerk of Court via the CM/ECF system and upon all counsel of record through the CM/ECF system and via email to Attorney Dale A. Evans Jr., dale.evans@lockelord.com, attorney for Defendant.

**Respectfully submitted this 1st Day of September 2023**

> **The Florida Legal Advocacy Group of Tampa Bay**
> _/s/ Adam S. Levine_
> Adam S. Levine, M.D., J.D.
> Florida Bar #78288
> 1180 Gulf Boulevard, Suite 303, Clearwater, FL 33767
> (727) 512 – 1969 [Telephone]
> (866) 242 – 4946 [Facsimile]
> aslevine@msn.com [Primary E-mail]
> alevine@law.stetson.edu [Secondary E-mail]
> Attorney for the Plaintiff