UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DANIELLE MARIE GEGAS,**

**Petitioner,**

v.                                    Case No: 6:22-cv-2299-PGB-EJK

**ST. MATTHEW'S UNIVERSITY**
**SCHOOL OF MEDICINE,**

**Defendant.**
_____/

## ORDER

This cause comes before the Court on Danielle Gegas's Motion for a Preliminary Injunction. (Doc. 31 (the "**Motion**")). Defendant St. Matthew's University School responded in opposition. (Doc. 32). Upon consideration, Plaintiff's Motion is due to be granted.

## I.    BACKGROUND

This case stems from an allegation that St. Matthew's University School of Medicine ("**Defendant**" or the "**University**") wrongfully precluded Danielle Gegas ("**Plaintiff**") from taking a requisite medical school exam notwithstanding her qualifications and readiness to do so. (Doc. 2, (the "**Complaint**") ¶ 1).

Plaintiff is a currently registered medical student with Defendant, a Florida-registered foreign for-profit corporation.[1] (*Id.* ¶ 3). Plaintiff initially enrolled as a

---

[1]    Defendant has waived any arguments pertaining to personal jurisdiction because it has not raised any such arguments in its Motion. (Doc. 22); *Ins. Corp. of Ireland v. Compagnie des*

medical student at the American University of the Caribbean, St. Maarten on May 1, 2016. (*Id.* ¶ 8). She later transferred to Defendant, matriculating on January 8, 2018 with an anticipated graduation date of December 25, 2021. (*Id.* ¶ 10). Like most medical students, Plaintiff was preparing to enter a Residency program upon graduation from medical school in order to complete her post-graduate medical training. (*Id.* ¶¶ 11, 28). Medical students secure Residency opportunities through the National Residency Internship Match (the "**Match Program**") in their fourth year of medical school. (*Id.* ¶ 29).

At some point throughout her clinical rotations, it became apparent that Plaintiff was actually on track to graduate as early as May 2021, which would enable her to enter, along with her spouse, into the Couples' Match Program—an opportunity for married couples to enter the program jointly, so that they can pursue Residency internships in the same geographic location. (*Id.* ¶¶ 11, 30). Plaintiff subsequently relied on this anticipated graduation date in terms of planning her wedding date with the expectation that she would be able to participate in the Couples' Match Program. (*Id.* ¶ 12).

To be eligible for the Match Program, medical students must complete certain requirements in accordance with national and school-specific standards,

---

*Bauxites de Guinee*, 456 U.S. 694, 704 (1982) ("Finally, unlike subject-matter jurisdiction, which even an appellate court may review *sua sponte*, under Rule 12(h), Federal Rules of Civil Procedure, '[a] defense of lack of jurisdiction over the person ... is waived' if not timely raised in the answer or a responsive pleading.")

including the Step I and Step II portions of the United States Medical Licensing Examination ("**USMLE**"). (*Id.* ¶ 95). The University disclosed in its Clinical Medicine Handbook its requirement that students pass a third-party's pre-test as a prerequisite to taking Step II of the USMLE. (*Id.* ¶ 16). Defendant did not, however, disclose this requirement on its website. (*Id.*). The crux of this dispute stems from Plaintiff's claim that the University unlawfully refused to certify her for eligibility to take Step II.[2] (*Id.* ¶ 17).

Plaintiff alleges that Defendant unlawfully applied arbitrary and capricious standards in refusing to allow her to take Step II. (*Id.* ¶ 125). For one, Plaintiff alleges that, despite its awareness of her Attention Deficit Hyperactivity Disorder, Defendant refused her request for exam accommodations. (*Id.* ¶ 19). However, after denying this request, Defendant demands that Plaintiff request these accommodations once again before taking her Step II exam. (*Id.*).

Second, Plaintiff suggests that Defendant intentionally aimed to keep students longer than they needed to be in medical school for business purposes, claiming that two Clinical Deans visited the Cayman Islands during the last part of her second year to discuss delays during the last two years of medical school and the likelihood that graduation would be delayed and cost more. (*Id.* ¶ 45). Defendant allegedly told Plaintiff that she should slow down and not anticipate

---

[2]   Plaintiff claims that Defendant has also delayed or prevented other students similarly situated to Plaintiff from graduating on time by refusing to certify them for Step II eligibility as well. (*Id.* ¶ 17). While those similarly situated students have not requested relief before this Court, the Court makes note of Plaintiff's claims here to reflect the systemic nature of her allegations against Defendant.

graduating in four years. (*Id.* ¶ 46). Defendant encouraged Plaintiff to give up a clinical rotation that she had already secured in New York in favor of another student. (*Id.* ¶ 47). When Plaintiff chose to remain in the rotation because she had already relocated to New York and found housing, Defendant allegedly punished her by subjecting her to longer intervals between her rotations and by changing her schedule, interfering with her wedding plans. (*Id.*). When Plaintiff protested, Defendant told her, "Maybe if your priorities were on your medical education, you wouldn't be having these problems (trying to remain on target to graduate in four years)." (*Id.* ¶ 48). Defendant stated that the reason she had not been afforded her preferred clinical rotation was because it was only provided to students completing their third year even though Plaintiff was in fact completing her third year at that time. (*Id.* ¶ 49).

Plaintiff claims that, despite these issues, Plaintiff was still able to excel in her clinical rotations and electives in order to remain on schedule for a May 2021 graduation date. (*Id.* ¶ 56). However, matters became more complicated for Plaintiff given the issues Defendant created with regard to the Comprehensive Clinical Science Examination ("**CCSE**"). (*Id.*). The CCSE is a pre-test that provides a benchmark for readiness to take Step II; however, neither the National Board of Medical Examiners ("**NMBE**") nor medical schools or the USMLE require that this test be taken or passed before taking Step II—the CCSE does not impact licensure in any state. (*Id.* ¶¶ 57, 59). Defendant, however, not only requires CCSE passage but goes a step further and mandates its own passing score that exceeds what is

considered the passing score nationally. (*Id.* ¶¶ 61, 62). Specifically, the NMBE pass rate cut-off for the CCSE is 209; Defendant, without explanation, made its passing score for its students 220 and then later changed this score to 222. (*Id.* ¶ 62).

Plaintiff's issue with respect to the CCSE began when, although not totally prepared but in an effort to be eligible for the Couples Match, she asked Defendant to take the CCSE early to gauge her progress given her past difficulties with exam-taking. (*Id.* ¶ 72). In doing so, she contacted one of Defendant's professors because she was concerned about any potential repercussions were she to fail the exam. (*Id.*). Plaintiff relied on this professor's statement that there would be no penalties for failing except that Plaintiff would have to pay to take the exam again. (*Id.*). Plaintiff took the exam for the first time on July 15, 2021 and scored a 208—one point shy of the national passing score and several points shy of Defendant's cut-off. (*Id.* ¶ 73).

Subsequently, Plaintiff completed a review course and scored 211 on September 2, 2021 after Defendant had changed its passing score from 220 to 222 and accordingly refused to certify her for Step II eligibility. (*Id.* ¶ 75). On October 22, 2021, Plaintiff scored a 210. (Doc. 23, p. 3). On her fourth attempt in December 2021, Plaintiff scored 223 at which time Defendant's passing score was still 222. (*Id.*). However, although Defendant initially approved her for eligibility, Defendant changed its mind and ultimately Defendant still refused to certify her at this time. (Doc. 2, ¶ 78). Plaintiff thereafter scored 214 and 220, respectively, on

her next two attempts. (Doc. 23, p. 3). Of note, at one point Plaintiff was told that, to move forward, she would have to score on the CCSE as high as 260, a score that is approximately in the 98th percentile of the exam.[3] (Doc. 2, ¶ 76). Plaintiff was not afforded a remediation plan at this time. (*Id.*).

To bolster her claim, Plaintiff cites other positive metrics of performance reflected throughout her time as a student at the University. (*Id.* ¶ 91). For instance, the Dean of Clinical Sciences confirmed that Plaintiff's transcript reflected her completion of her clinical clerkships and electives with all "Honors" and "High Pass" grades and that her cumulative grade point average met or exceeded those of her colleagues in most cases. (*Id.* ¶ 91; Doc. 2-3, p. 1). Plaintiff also has provided her Medical Student Performance Evaluation, in which she received glowing reviews and positive performance ratings, including statements reflecting her "steadfast and focused commitment to the study of medicine" and her "maturity and dependability during her clinical rotations." (Doc. 2-4, p. 1). She additionally demonstrated "poised leadership" and excellent performance in that she "was the medical student most often relied upon for emergency operations during her Surgical rotation." (*Id.*). Furthermore, Plaintiff alleges that she was surely competitive for the Match program given the fact that she received two

---

[3] The Court states this fact based on the data provided publicly by the National Board of Medical Examiners. *See National Medical Board Examiners, Subject Examination Program Comprehensive Clinical Science Examination Score Interpretation Guide*, 2 (September 2020), https://www.nbme.org/sites/default/files/2021-02/Comprehensive_Clinical_Score_Interpretation_Guide_2021.pdf (last visited August 17, 2023).

interviews and was waitlisted for a third interview immediately after she applied to ten Family Medicine Residency programs without Step II results. (*Id.* ¶ 50). Residency interviews are necessary for acceptance and are only afforded to competitive candidates; it is atypical to receive an interview without having completed Step II. (*Id.*). Plaintiff asserts that these facts, among others listed in the Complaint, speak to Defendant's unlawfully arbitrary and capricious application of its standards. (*Id.* ¶ 109). Plaintiff's graduation date has been delayed until, at the earliest, 2024, and she has missed the opportunity to participate in the Couples Match program with her partner as a result of Defendant's refusal to certify her. (*Id.* ¶ 38). Plaintiff has also incurred additional costs that she may not have otherwise had she matriculated at a different medical school. (*Id.* ¶¶ 38, 102).

## II.    STANDARD OF REVIEW

The grant or denial of a preliminary injunction rests in the discretion of the district court. *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).[4] The district court, however, does not have unbridled discretion and must exercise that discretion in light of the "four prerequisites for the extraordinary relief of preliminary injunction." *Id.* (internal quotation marks omitted). The parties agree that the four prerequisites which Plaintiffs must establish are: (1) a substantial likelihood of success on the merits of the underlying

---

[4]    The Eleventh Circuit has adopted as binding precedent all decisions rendered by the former Fifth Circuit.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

case; (2) irreparable harm in the absence of an injunction; (3) that the harm suffered by Plaintiffs in the absence of an injunction would exceed the harm suffered by Defendants if the injunction issued; and (4) that an injunction would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002); *Miccosukee Tribe of Indians of Fla. v. United* States, 571 F.Supp.2d 1280, 1283 (S.D. Fla. 2008). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to *each* of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (emphasis added).

## III.   PROCEDURAL BACKGROUND

Following Plaintiff's original Motion (Doc. 31) and Defendant's Response (Doc. 32) in which Defendant correctly observed that Plaintiff failed to comply with the Local Rules of this Court, the Court ordered Plaintiff to remedy these procedural deficiencies before the Court would rule on the merits. (Doc. 34). Pursuant to said Order, Plaintiff filed a Verified Motion to Amend her First Motion for Preliminary Injunction along with a corresponding notice of compliance in response to cure said deficiencies. (Docs. 37, 38).[5] Plaintiff's Motion is now ripe for review.

---

[5]   Plaintiff asserts in her Verified Motion that, apart from curing the deficiencies pertaining to her compliance of the Local Rules, said Motion is substantively nearly identical to her First Motion for Preliminary Injunction with the exception of a few new allegations in her Amended

## IV.    DISCUSSION

The Court individually addresses each of the elements that must be met to obtain a preliminary injunction.

### A.    Likelihood of Success on the Merits

Plaintiff has shown that she is likely to succeed on the merits of at least one of her various claims.

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Navarro v. Florida Inst. Of Tech. Inc.*, 22-cv-1950 2023 WL 2078264, at *4 (M.D. Fla. Feb. 17, 2023) (citations omitted). For purposes of showing that a plaintiff is likely to prevail on the merits, a plaintiff need only demonstrate the likelihood of prevailing on one cause of action. *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1289, 1298, 1299 (11th Cir.2005)[6].

"[A] consumer claim for damages under [the] FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (citations omitted). Florida law permits a FDUPTA claim to accompany a related breach of

---

Complaint, filed after her original Motion for Preliminary Injunction. (Doc. 38, p. 2). The Court acknowledges that Defendant has not had the opportunity to respond to these new allegations. However, because the Court did not consider these new allegations in rendering its decision on Plaintiff's Motion for Preliminary Injunction, Defendant is not prejudiced here.

[6]    For simplicity's sake, the Court will anchor its analysis on Plaintiff's FDUPTA claim for purposes of determining whether Plaintiff has met her burden of showing a likelihood of success on the merits. (Doc. 2, ¶¶ 112–123).

contract claim if the FDUPTA claim challenges the acts underlying or precipitating the breach and does not "rely solely on a violation of the [contract] as a basis for assertion of a[n] FDUPTA claim." *Kenneth F. Hackett & Assocs., Inc. v. GE Cap. Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010) (citing *Rebman v. Follett Higher Educ. Grp., Inc.*, 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008)). Allegations of arbitrary and capricious changes to grading and advancement can constitute valid FDUPTA claims under Florida law. *Roberson v. Health Career Inst. LLC*, No. 22-CV-81883-RAR, 2023 WL 4991121, at *12 (S.D. Fla. Aug. 3, 2023). Courts are split as to whether a plaintiff need plead her FDUPTA claim under the heightened pleading standard. *See Harris v. Nordyne, LLC*, No. 14-CIV-21884, 2014 WL 12516076, at *4 (S.D. Fla. Nov. 14, 2014) ("This Court joins several decisions in holding that the requirements of Rule 9(b) categorically do not apply to claims under FDUTPA.").

All things considered, Plaintiff has sufficiently shown that she, at the very least, is more likely than not to succeed on her FDUPTA claim, satisfying her burden of showing a likelihood of success on the merits. *Navarro*, 2023 WL 2078264, at *4. Specifically, the Court finds that Defendant does not sufficiently counter Plaintiff's arguments concerning Defendant's arbitrary and capricious grading requirement changes as applied to her, counseling in favor of a preliminary injunction here. *Roberson*, 2023 WL 4991121, at *12.

Plaintiff presents a litany of documents and key pieces of evidence suggesting Defendant's inappropriate conduct. (*See generally* Docs. 2-1–2-15).

This information includes an undisputed record of Plaintiff's passing Defendant's school-specific, above and beyond standard for a pre-test exam that is not mandatory for national advancement toward residency, particularly positive performance reviews, hallmarks of competency considering the interview requests Plaintiff was able to secure even without her Step II certification, and several other showings of excellence. (*Id.*). Nevertheless, Defendant still refused to permit her to take Step II. (Doc. 38, p. 11). Even worse, Defendant allegedly told Plaintiff that she would have to score as high as a 260 on her pre-test despite its declared standard of 222, which strikes the Court as a particularly arbitrary and capricious mandate absent compelling reasons. (Doc. 2, ¶ 62). Defendant has not made such a showing of such reasons. (*See generally* Doc. 32).

When given the opportunity to address these idiosyncrasies, Defendant makes several arguments, all of which the Court finds unavailing. First, Defendant argues that it should make a difference in some respect that Defendant actually changed its CCSE grading requirement of 222 in 2020 as opposed to 2021. (Doc. 32, pp. 7–8). Even if Defendant is correct, the Court does not find this information is relevant considering that Plaintiff passed this standard by a point regardless of what year it was implemented; the timing of this requirement thus has no bearing on Defendant's demand that Plaintiff score at any point a 260, a mark astronomically higher than its previous standards, after she passed with a 223. (Doc. 2, ¶ 62).

Second, Defendant argues that when "Plaintiff took the CCSE on December 18, 2021, there was *no* CCSE minimum score in place, and instead, a student's readiness to take the Step [II] was based on a range of factors of which CCSE performance was but one component." (Doc. 32, p. 8). This argument similarly fails because Defendant does not address what deficiencies Plaintiff presented other than her "test-taking skills" given that she struggled initially with the CCSE. (*Id*. at p. 9). This again does not account for Defendant's demanding that Plaintiff score so much exceptionally higher than what it required of its other students at any given point. Nor does it account for an explanation as to how Plaintiff was able to secure, even without Step II, multiple residency interviews—a hallmark of her competency. (Doc. 2, ¶ 50).

Third, Defendant claims it is relevant that "SMU previously informed its students that achievement of a passing score on the CCSE merely results in the student's portfolio being forwarded to the school's certification committee for consideration of the Step [II] certification." (Doc. 32, p. 8). Again, the Court does not find that this properly addresses Plaintiff's argument: Defendant here fails to cite to any specific evidence demonstrating why Plaintiff's otherwise stellar record was insufficient for certification. (*Id*.). Nor does Defendant sufficiently address Plaintiff's verified allegation that Defendant made a concerted effort to retain students as evidenced by the fact that multiple deans came to the University to convey that graduation delays would possibly ensue, resulting in greater fees for Defendant in the height of the pandemic. (Doc. 2, ¶ 45). In light of Plaintiff's

overwhelmingly positive performance reviews otherwise and her allegations concerning Defendant's duplicitous efforts to prevent her from advancing, the Court concludes that Plaintiff has sufficiently shown that it is at least more likely than not that Defendant engaged in unfair or deceptive practices that resulted in harm. (*See generally* Doc. 2); *Rollins*, 951 So. 2d at 869. Accordingly, Plaintiff has met her burden with respect to this element.

**B.      Irreparable Harm**

Plaintiff has also met her burden of showing irreparable harm here.

Various courts have found that a forced delay in graduation can demonstrate irreparable harm. *See, e.g.*, *Doe v. Univ. of Conn.*, No. 20-cv-92, 2020 WL 406356, at *2, 2020 U.S. Dist. LEXIS 11170 (D. Conn. Jan. 23, 2020) (finding irreparable harm where a college senior plaintiff faced a two-year suspension which was "highly likely" to "forever change the trajectory of his education and career" because he "would need to explain a gap on his résumé in future applications to schools or jobs" and a "truthful explanation would seriously hinder his prospects" (brackets and internal quotation marks omitted)); *Doe v. Middlebury Coll.*, 2015 WL 5488109, at *3, 2015 (finding irreparable harm where the plaintiff had a job offer "contingent on the successful completion of his degree" and concluding that "money damages cannot compensate for the loss of [the plaintiff's] senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . with this particular employment," and noting that the plaintiff "would have to explain, for the remainder of his professional life, why his

education either ceased prior to completion or contains a gap" and would therefore suffer "imminent and non-speculative harm"); *see also Nokes v. Miami Univ.*, No. 17-cv-482, 2017 WL 3674910, at *13, 2017 U.S. Dist. LEXIS 136880 (S.D. Ohio Aug. 25, 2017) (declining to "embrace a rule that suspension and harm to an individual's reputation cannot constitute irreparable harm as a matter of law"); *see King v. DePauw Univ.*, No. 14-cv-70, 2014 WL 4197507, at *13, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) (finding, where the plaintiff would "forever have either a gap or a senior-year transfer on his record," it was "inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal" untoward information about himself that would create stigma, thus representing irreparable harm).

Although a preliminary injunction requires a showing of "imminent" irreparable harm, a delay in seeking a preliminary injunction for several months undermines the strength of the request for said injunction but does not automatically preclude a court from granting one. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Defendant relies on two principal arguments here. First, invoking *Nivel Parts & Mfg. Co. v. Textron, Inc.*, No 17-cv-146-J-32JRK, 2017 WL 1552034, at *2 (M.D. Fla. May 1, 2017), Defendant claims that Plaintiff fatally has not shown that her loss of goodwill or professional reputation caused by a delay is anything more than speculative. (Doc. 32, p. 10).

The Court does not find that Plaintiff's loss of goodwill or damage to her professional reputation would be speculative in this context. Like the *Middlebury College* court, this Court too finds that Plaintiff's harm would be concrete: if Plaintiff were forced to wait another year to register for the Match program, she would certainly have to explain to all prospective employers the gap in her timing for eligibility. While the Court cannot predict how this delay would impact any individual employer's hiring calculus, the Court can, with a high degree of confidence, conclude that the strength of Plaintiff's candidacy would—across the board—be diminished from such a delay. This in it of itself is sufficient to show irreparable harm.

Defendant's second argument is that Plaintiff should not be entitled to injunctive relief because of the delay with which she filed her Motion, invoking citing *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016); (Doc. 32, p. 12). While Defendant's argument is well taken, the Court does not find that the *Wreal, LLC* court's findings necessarily warrant a denial of an injunction in this case. Specifically, the plaintiff there involved a trademark dispute, where every day that went by entailed a greater magnitude of infringement. *Wreal, LLC*, 840 F.3d at *1247. Here, however, Plaintiff's irreparable harm does not truly ensue until the period for Match registration expires at the end of this month; in other words, it is the finality of a year-long delay that Plaintiff seeks to avoid. (*See generally* Docs. 2, 38). Accordingly, the Court finds that this is one of the instances in which counsel's delayed filing of the preliminary injunction—though not ideal—is not

"necessarily fatal" to Plaintiff's claim for relief. *Wreal*, 840 F.3d at *1248. The Court is thus persuaded that Plaintiff has made a showing of irreparable harm for purposes of prevailing on her Motion.

### C.      Balance of Harms Between the Parties

Defendant argues that the harm to Defendant if the Court were to grant a preliminary injunction would outweigh the harm to Plaintiff caused from a denial. (Doc. 32, p. 13). The Court disagrees.

When weighing the balance of harms as it pertains to the non-movant, a court is within its discretion to discount the harms that would result from an injunction when the non-movant brought the harms upon itself. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

Here, Defendant argues that such an injunction "would substantially undermine [Defendant's] ability to ensure that its students are adequately prepared for the practice of medicine." (Doc. 32, p. 13). Consequentially, this would "[rob] [Defendant] of its academic discretion and could diminish the quality of the physicians that it graduates." (*Id.*).

Defendant's argument does not pass muster here because it is precisely Defendant's original and allegedly unreasonable discretion not to certify Plaintiff that resulted in Plaintiff's request for injunctive relief. *Novartis Consumer Health, Inc.*, 290 F.3d at 596. Moreover, the Court is not convinced that the injunction requested here would overwhelmingly deprive Defendant of its academic

discretion or diminish the quality of its graduating physicians as it so purports. (Doc. 32, p. 13). Plaintiff's request for relief is narrow and idiosyncratic in scope— Plaintiff is requesting only that *she individually* be permitted to take her exam and participate in the Match program rather than requesting a sweeping change to Defendant's academic standards generally. (Doc. 38, p. 26). In other words, the Court here is not coercing Defendant to change its existing standards or enjoining Defendant from altering its standards in the future. Such an injunction would therefore not pose harm to Defendant that would outweigh what could very well be life-altering consequences for Plaintiff. Plaintiff thus has met her burden on this element as well.

### D.    Whether the Injunction Serves the Public Interest

The Court finds that a preliminary injunction in this instance would not be adverse to the public interest.

A preliminary injunction should not be issued if it would be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Upholding an enforceable contract for purposes is not adverse to the public interest. *Int'l Bhd. of Boilermakers v. Loc. Lodge D238 of the Cement, Lime, Gypsum & Allied Workers Div. of the Int'l Bhd. of Boilermakers*, 865 F.2d 1228, 1236 (11th Cir. 1989).

Defendant concedes that Plaintiff presents a genuine service to the public interest in the form of ensuring that contracts are upheld. (Doc. 32, p. 15). In the same breath, Defendant then proceeds to rehash arguments justifying its conduct

with respect to its contract with Plaintiff and contends that "Plaintiff provides no reason in public policy why the Court should modify a private university's contractual relationship with only one student." (*Id.*). The Court disagrees. Once again, the fact that such an injunction would only impact the school's treatment of one individual buttresses the conclusion that such a decision would not be adverse to the public interest, especially considering Plaintiff's argument that there is a separate public policy interest in affording Plaintiff the opportunity to show the medical evaluators that she is qualified to join the ranks of our nation's physicians in the wake of a present shortage in doctors. (Doc. 38, p. 24). Plaintiff thus meets her burden of showing that such an injunction would not be adverse to the public interest.

### E.    Whether Plaintiff's Request for an Injunction Improperly Seeks Ultimate Relief

Plaintiff's request for relief here is not improper.

In support of the proposition that Plaintiff does not meet her heavier burden needed for affirmative relief as opposed to maintaining the status quo, Defendant invokes *Pinkston v. Univ. of S. Fla. Bd. of Trustees*, No. 15-cv-1724, 2016 WL 11469181, at *2 (M.D. Fla. May 18, 2016), report and recommendation adopted at 2016 WL 3345268 (M.D. Fla. June 15, 2016) (citation omitted). While the *Pinkston* court made plain that courts are generally expected to refrain from intervening with academic decisions, the court also wrote that judicial intervention can be

appropriate "in rare circumstances." *Id.* at *4. The Court finds that this instance constitutes one of those rare circumstances.

The Court reincorporates its aforementioned reasoning here and additionally directs the parties to its previous Order on Defendant's Motion to Dismiss, where the Court laid out all of the reasons why Plaintiff has sufficiently alleged Defendant's arbitrary and capricious decision-making at her expense. (*See generally* Doc. 33).

Plaintiff has thus met her burden for purposes of her Motion.

## V. DISCUSSION

For the aforementioned reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

Accordingly, it is **ORDERED and ADJUDGED** as follows:

1. Defendant is hereby **ORDERED** to allow Plaintiff to take USLME Part II exam as soon as is practicable and to participate in the 2023-2024 Match Program.

2. Defendant shall comply with the specific terms of relief set forth in a separate, forthcoming Order.

**DONE AND ORDERED** in Orlando, Florida on September 4, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties